John Edward DEVOOGHT,
III, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–84–214.

Court of Criminal Appeals of Oklahoma.

June 25, 1986.

Michael C. Turpen, Atty. Gen., Robert W. Cole, Asst. Atty. Gen., Oklahoma City, for appellee.

Opio Toure, Rick Ault, Asst. Public Defenders, Oklahoma City, for appellant.

## OPINION

BUSSEY, Judge:

John Edward DeVooght, III, was convicted in Oklahoma County District Court of

Murder in the First Degree and punishment was assessed at life imprisonment.

Appellant was tried before a jury for the murder of six-year-old Patricia Carter who had been found raped, sodomized, and beaten to death in a field near her home on the morning of October 2, 1982. Appellant was fifteen, nearly sixteen, years old at the time. He and his mother, Linda Duke, had been staying at the victim's mother's home where Duke was responsible for the care of the three Carter children.

Kathie Carter returned home from work between 3:00 and 4:00 a.m., October 2, to find Patricia and appellant both gone. At 5:30 a.m., appellant was located at his grandmother's home some thirteen blocks away. In an attempt to find Patricia, the police asked him if he knew where she was. He did not know, and could not remember how he had gotten to his grandmother's house that morning because he had been drinking homemade beer the night before. The investigating officers thought that the child could have followed appellant when he left the Carter residence and told him they would like to jog his memory about the route he took to his grandmother's house. He accompanied the officers in the backseat of their cruiser while they toured the streets between the two residences. Nothing helped to restore his memory, and he was later taken to the police station so they could record his statement. All other adults involved were also to give their statements at the police station. Appellant continued to maintain his lack of memory.

The officers started to leave the station to return to the site of the investigation. At that time, they were informed the little girl had been found dead. Appellant was returned to the station. Later that same day, he and his mother were advised of their rights, appellant was interrogated, and he was arrested.

Appellant claims that he was actually arrested at 5:30 a.m. when the officers first spoke with him, and that his arrest was illegal because the police acted without probable cause to believe that he had committed a crime. Therefore, he argues, the statements he made and the evidence found as a result should have been suppressed.

During a hearing on appellant's motion to suppress, the investigating officers testified that appellant was not under arrest, was not suspected of a crime, and was free to leave prior to the time Patricia's dead body was found. Until then, they did not know a crime had been committed and their purpose was simply to locate a missing juvenile. Appellant never indicated he did not want to help the officers, and never asked to leave them. Additionally, he requested not to be returned to the Carter residence for fear of Mr. Carter who had earlier tried to assault him.

■ Arrest is the "taking, seizing, or detaining the person of another either by touching, or by any act which indicates an intention to take him into custody and subject the person arrested to the actual control and will of the person making the arrest...." *Scott v. State*, 617 P.2d 240 (Okl.Cr.1980). However, when a person voluntarily cooperates with the police and is free to leave, there is no arrest. *Davis v. State*, 620 P.2d 1346 (Okl.Cr.1982). If there is no manual seizure or any resistance, the intentions of the parties are very important. There must be an intent to arrest by the officer and an understanding by the arrestee that submission is necessary. *Holmes v. State*, 568 P.2d 317 (Okl. Cr.1977).

■ We find that appellant cooperated with the police voluntarily and that the officers did not intend to arrest him until Patricia was found dead. The only touching by the officers involved escorting appellant to their cruiser and putting him in the backseat after Gary Carter tried to assault him. Appellant's impression of whether he was under arrest is also pertinent. *Holmes*, supra. His request of the officers to not be taken back to the Carter residence where Gary Carter was located indicates his understanding that he was not under arrest.

■ At most, appellant could have been considered seized for investigative pur-

poses. But because it was justified at its inception and reasonably related in scope to the circumstances, there was no violation of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The law enforcement purposes served justified the length of the stop and actions taken. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). As discussed further in appellant's next assignment, the officers had some information that appellant was seen leaving the Carter home with the victim. Coupled with the fact that he could not remember his own path to his grandmother's house, it was reasonable for the police to ask his assistance in the search for the missing child.

■ Appellant also contends that his arrest was illegal because the police lacked probable cause to believe he had committed a crime when he was arrested. The trial judge found, as we do, that the officers intended to seize him at approximately 9:30 a.m. when they learned that Patricia was found dead. At that point, they had learned that appellant was the last person seen with the victim. Dena, Patricia's younger sister, had told her father, "I saw John take Patty out of the house. He had her by the arm and she was crying." Appellant and the victim were missing from their home and she was crying. The officers had learned that there had been a dispute on October 1, 1982, between appellant and the victim, appellant stepping on the victim's hand and his mother slapping him later as a result. Appellant reported to the officers that his intoxication had caused him to forget how he had even gotten to his grandmother's house from the Carter residence.

■ Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense had been or was being committed. 22 O.S.Supp.1982, § 196; *Castleberry v. State*, 678 P.2d 720 (Okl.Cr. 1984). Appellant contends that since there

was no direct evidence at the time of arrest to connect him to the crime, probable cause could not be established. Although direct evidence is sometimes cited in support thereof, it certainly is not required to prove probable cause. Similarly, circumstantial evidence may be used to prove guilt beyond a reasonable doubt. *Luker v. State*, 552 P.2d 715 (Okl.Cr.1976). We find no error.

As a subproposition of the previous assignments, appellant argues that his statements to the police and physical evidence obtained thereby were products of an illegal arrest and should have been suppressed at trial. Having previously found his arrest to have been legally made, this assignment is without merit.

■ Appellant next asserts that his inculpatory statements to the police and the evidence obtained therefrom should have been suppressed as being obtained in violation of due process and 10 O.S.1981, §§ 1107 and 1109. He complains that he was held for interrogation without being brought before a judge as required by 10 O.S.1981, § 1107. Appellant's assignment is not specific on this point, but the record does indicate that the day of the arrest was a Saturday. The officer who interrogated appellant testified that until after he spoke with DeVooght on Saturday between 3:00 and 4:00 p.m., he was only being held as a material witness.

A memorandum from the Presiding District Judge to the police department was introduced which gave directives for the handling of juveniles in police custody. These directives were in compliance with 10 O.S.1981, § 1107, and the police apparently attempted to follow them in appellant's case.

Being a Saturday, it appears that a district judge was difficult to contact. But, appellant was admitted to the Oklahoma County Juvenile Detention Home within the hour following being interviewed on the afternoon of October 2. The sequence of events is not well presented in the record. It appears, however, that he was not delayed from being admitted to the

juvenile center for the purpose of interrogation and our review does not reveal a violation of the pertinent statute.

■ Title 10 O.S.1981, § 1109, prohibits admission of statements of children into evidence unless the questioning is done in the presence of the child's parent, guardian, or custodian and the child and parent are first advised of their rights. Appellant and his mother were given a rights waiver form which they each read and signed before interrogation. The form stated the *Miranda* [1] warnings. Appellant does not contend that he and his mother were unable to read and understand their rights, but instead that he did not have the "supportive presence" of his mother because she had a hangover and had been seen drinking beer during the day. *M.D.G. v. State*, 584 P.2d 1365 (Okl.Cr.1978). Appellant also complains that he had a hangover from drinking an alcoholic beverage the night before and was not sure if he understood his rights at the time he signed the waiver beause he was not feeling well.

We do not find a violation of the statute or due process. *J.A.M. v. State*, 598 P.2d 1207 (Okl.Cr.1979). The officers who interrogated appellant testified that both De-Vooght and his mother appeared lucid; neither appeared intoxicated. Neither complained to the officers they could not understand the form. One officer told the pair that he could not discuss the case with them unless they signed it. The waiver form acknowledges that appellant and his mother understood the form and were not coerced to sign it. He also complains that he and his mother were not able to privately confer prior to signing the waiver. But, it appears that neither requested privacy. *C.S.M. v. State*, 599 P.2d 426 (Okl.Cr.1979). This assignment of error is without merit.

Appellant contends that the charging information was unconstitutionally vague and ambiguous. It states:

COUNT 1: ON OR ABOUT THE 2ND DAY OF OCTOBER, 1982, A.D., THE CRIME OF MURDER IN THE FIRST DEGREE WAS FELONIOUSLY COMITTED IN OKLAHOMA COUNTY, OKLAHOMA, BY JOHN EDWARD DE-VOOGHT III WHO WHILE IN THE COMMISSION OF FORCIBLE RAPE WILFULLY AND UNLAWFULLLY KILLED PATRICIA RENE CARTER BY BEATING HER WITH HIS HANDS INFLICTING MORTAL WOUNDS WHICH CAUSED HER DEATH ON 2ND DAY OF OCTOBER, 1982,, [sic] CONTRARY TO THE PROVISIONS OF SECTION 701.7 OF TITLE 21 OF THE OKLAHOMA STATUTES, AND AGAINST THE PEACE AND DIGNITY OF THE STATE OF OKLAHOMA;

The term of which appellant complains as being ambiguous is "forcible rape." He contends that there is no statutory or jurisprudential definition in Oklahoma for "forcible." This is the very word used by the Legislature in defining rape as a predicate felony for felony murder in the first degree. 21 O.S.1981, § 701.7(B).

■ Appellant asserts, and we agree, that both due process and Oklahoma statutes require "that every material element of the offense be charged with definiteness and certainty." This may be accomplished by "[a] statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended." 22 O.S.1981, § 401. "Further, a criminal statute requires only reasonable certainty and the prohibited act may be characterized by a general term without the aid of definition, if that term has a settled and commonly understood meaning which doesn't leave a person of ordinary intelligence in doubt." *Pratt v. State*, 642 P.2d 268, 270 (Okl.Cr.1982). We think forcible is such a word. It is a word understood by most people without jurisprudential aid. The charging information used language to demonstrate how the rape was forcible: "by beating her with his hands inflicting mortal wounds...." We do not believe that a person of common understanding would be misled by the lan-

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

guage, nor unprepared to defend against the charge upon a first or subsequent prosecution. *Campbell v. State*, 640 P.2d 1364 (Okl.Cr.1982).

Next, appellant asserts that the jury selected to try his case did not represent a fair and impartial cross section of the community because those who could not impose the death penalty were removed for cause.[2] He complains also that such a jury is conviction-prone, excludes identifiable groups, and is improperly focused on the sentencing phase.

DeVooght relies on the case of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), for his claim that "death qualifying" a jury denied him a jury consisting of a fair and impartial cross section. But *Taylor* does not guarantee such a jury. Rather, the United States Supreme Court did hold therein that the Sixth Amendment to the Constitution does afford a criminal defendant the opportunity to have a jury drawn from venires representative of the community. The Court denied any right to have a jury panel which mirrored the community. *Id.*

> Although the right to a jury trial includes the right to a jury venire drawn from a representative cross-section of the community, it does not include the right to be tried by jurors who are unable or unwilling to follow the law and the instructions of the trial judge in capital cases. *Lockett v. Ohio*, 438 U.S. 586, 596–97, 92 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978).

*Keeten v. Garrison*, 742 F.2d 129 (4th Cir. 1984). See also *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

■ We find appellant's conclusion that "death qualified" juries are conviction prone to be unsubstantiated. We rejected a per se constitutional rule requiring reversal in *Hogue v. State*, 652 P.2d 300 (Okl.Cr. 1982). For the reasons stated therein, we again deny such a rule. Appellant's other claims that identifiable groups were excluded and that the jury was focused upon the

sentencing phase are also unsubstantiated and meritless. See also *Smith v. Balkcom*, 660 F.2d 573 (5th Cir.1981) for that court's discussion and rejection of assertions like those of appellant's.

Appellant next contends the trial court erred in admitting into evidence the hearsay statements of the victim's four-year-old sister Dena. Dena made statements on three occasions concerning appellant "dragging" Patricia out of the house. She told her father and several police officers such things as she saw her sister on the kitchen floor with her nose bleeding. She told them that appellant was there and either hit or kicked the victim; that Patricia was crying. The adults were allowed to testify at trial concerning these statements Dena made to them on October 2, 1982 after a finding was first made that she was incompetent to testify. The trial court admitted them under the residual exception to the hearsay rule. 12 O.S.1981, § 2803(24).

*Stanberry v. State*, 637 P.2d 892, 895 (Okl.Cr.1981), provides:

> In order for evidence to be admitted pursuant to Section 2803(24), five conditions must be met: (1) The proponent of the evidence must give the adverse party the notice specified within the statute; (2) The statement must have circumstantial guarantees of trustworthiness equivalent to the 23 specified exceptions listed in Section 2803; (3) The statement must be offered as evidence of a material fact; (4) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts; (5) The general purposes of the evidence code and the interests of justice must be served by the admission of the statement into evidence.

We also noted therein that the "trustworthiness of a statement should be analyzed by evaluating the facts corroborating the veracity of the statement, the circumstances in which the declarant made the statement, and the incentive he or she had to

---

**2.** *See Witherspoon v. Illinois,* 391 U.S. 510, 88    S.Ct. 1770, 20 L.Ed.2d 776 (1968).

speak truthfully or falsely; and careful consideration should be given factors bearing on the reliability of the reporting of the hearsay by the witness." *Id.*

In the first instance, we find that the appellant was notified well in advance of trial of the prosecution's purpose to use the evidence. As the record on appeal reflects, proper notice was served.

Also, as the judge noted on the record at trial, the various statements of Dena concerning what she observed were consistent with one another though there were discrepancies in some of the details. He did not find the variations significant, and indicated that he found a high degree of trustworthiness.

On the morning of the investigation, Dena first told her father upon questioning of seeing appellant and the victim leave the home together. She twice again repeated the story in front of police officers that day. She and the victim shared the same bedroom from which Patricia was taken.

Dena's statements were corroborated by appellant's testimony that he did recall seeing the victim on the kitchen floor with a bloody nose. He also thought he could have hit her with his fist. Another witness saw appellant early that morning walk with a little girl across the field where the victim was found.

The statements of Dena were important in this case because she was the only person to see appellant and Patricia leave the house and to recall the circumstances under which they left. DeVooght claimed to have only vague recollections as to what happened. At the time of this reported incident, all adults were out of the home and Dena's infant sister, Andy, was the only other person present. It was also reported that until the dispute of appellant with Patricia on October 1, that DeVooght had gotten along well with the Carter children. There is no evidence in the record showing an incentive for Dena to falsely report what she observed, nor that the witnesses relaying her statements were unreliable. *Id.*

The Confrontation Clause of the Sixth Amendment is satisfied if the hearsay declarant is unavailable and there is shown sufficient indicia of reliability. *Newbury v. State*, 695 P.2d 531 (Okl.Cr. 1985). Dena was declared unavailable as a witness due to her age. As previously discussed, the trustworthiness of the statements was borne out by the corroborating evidence and consistency of the statements. Therefore, the statements were properly admitted into evidence.

Human hairs and cloth fibers were removed from the victim's body, sent to the crime lab, and introduced at trial. Appellant claims they should not have been admitted because the victim's body had been covered by raincoats of police officers while it lay in the field where found. It was raining during the morning of the investigation and the body was ordered covered to preserve evidence. Appellant claims that since unknown foreign hairs and fibers could have contaminated the body, a proper chain of custody could not be established as required, citing *Driskell v. State*, 659 P.2d 343 (Okl.Cr.1983).

We explained in *Driskell* that in considering whether an adequate foundation has been laid, 1) the nature of the articles, 2) the circumstances surrounding its preservation, and 3) the likelihood of contamination, alteration, or tampering should all be considered. *Id.* at 354–55. Hair and fiber evidence consists of an expert comparing samples from two or more locations and reaching a conclusion as to whether they are derived from the same source. In this instance, the hair and fibers were those removed from Patricia's body, and hair samples taken from appellant's body and fiber samples taken from the clothes he wore the night of the assault. The expert testified that she was of the opinion the hair samples were from the same source and that the fiber samples were also from the same source.

The trial judge admitted the hairs and fibers while acknowledging the possibility they could have been conveyed by the raincoats. We find no abuse of the trial

court's discretion. Appellant does not contend that the samples themselves were in any way altered. Nor does he contend that there is a possibility anyone could have surreptitiously placed his hair and clothing fibers on the victim. Hair and fiber evidence is not of such a nature that it would be altered by the presence of foreign hair and fiber. Since the essence of such tests is identification by comparison and distinguishing various sources, the presence of multiple samples should not alter the results. It could only affect the weight to be given the evidence.

■ Appellant next contends that several photographs of the victim should not have been introduced at trial because their probative value was outweighed by the prejudicial effect. Photographs of a victim, especially a murder victim, should not be excluded merely on the basis of gruesome appearance unless their probative value is exceeded thereby. *Collins v. State*, 561 P.2d 1373 (Okl.Cr.1977). In order for the jury to understand the testimony of the police officers and medical examiner, the photographs are certainly relevant. The location and extent of the victim's wounds, the force of the rape, and the location of the body, were all matters of concern for the jury and which the pictures illuminated.

■ We find no abuse of the trial court's discretion in admitting the photographs. The "grizzly depictions" of which appellant complains were wounds inflicted during the attack. The trial judge allowed only two pictures into evidence and they did not illustrate any secondary or unnecessary injury to the body such as autopsy cuts or sutures. *Ritchie v. State*, 632 P.2d 1244 (Okl.Cr.1984); *Oxendine v. State*, 350 P.2d 606 (Okl.Cr.1958).

■ Appellant next relies upon our holding in *Cole v. Parr*, 595 P.2d 1349 (Okl.Cr.1979), for his assertion that he should not have been required to give samples of blood, semen, and saliva prior to the State testing the samples removed from the scene of the crime. In *Cole*, we held such to be error. But we held that the

"decisive issue in this case is whether an examination and analysis of the defendant's specimens would be of probative value in the prosecution of this defendant." *Id.* at 1351. Fourth Amendment protection is against intrusions not justified by the circumstances nor made in a proper manner. *Id.*

At the time appellant was compelled to give samples, probable cause to believe he had committed the crimes had been established through a preliminary hearing. A proper showing of probative value and medical justification for testing was made.

■ Rebuttal evidence may be admitted to repel, counteract, disprove, destroy, or explain facts offered by an adverse party or to clarify a disputed point. *White v. State*, 607 P.2d 713 (Okl.Cr.1980). Appellant complains of the evidence on rebuttal of two of the State's witnesses. A deputy sheriff testified that he observed appellant drink three ounces of 80 proof alcohol over a forty-five minute period. He testified that he observed no unusual or erratic behavior by appellant except for drowsiness. This was offered to counteract appellant's evidence that he reached a drunken stupor during the night of the crime upon drinking less than two liters of homemade beer.

■ The State also introduced the testimony of a psychiatrist concerning the phenomenon of "selective repression;" obviously an alternate explanation of De-Vooght's memory lapse following his consumption of the alcohol. We find no abuse of the trial court's discretion allowing admission of the rebuttal evidence. *Naum v. State*, 630 P.2d 785 (Okl.Cr.1981).

■ Appellant next assigns as error the trial court's refusal to give several of his requested instructions. Errors concerning instructions are judged on the basis of whether the entire instructions which are given fairly and correctly state the applicable law. *Tate v. State*, 664 P.2d 1036 (Okl. Cr.1983). Otherwise, the charge to be given the jury is a matter within the trial court's discretion. *Id.*

The instructions appellant requested concerned a death occurring during the commission of forcible rape and manslaughter. The instructions given by the trial court concerning forcible rape and felony murder were those provided in the Uniform Jury Instructions. And, we find that the instructions given correctly stated the applicable law. However, it is appellant's further contention that since the victim might have died before the rape occurred, manslaughter instructions should have been given.

■■■■■ The trial court should instruct only of offenses reasonably supported by the evidence. *Paregien v. State*, 630 P.2d 326 (Okl.Cr.1981). The evidence appellant cites in support of this theory is that there was little blood or fecal matter surrounding the anus and vagina when the victim was found. However, the medical examiner was of the opinion that the victim was alive when raped because of the damage caused to her by the injuries. He also said death was not instantaneous and that it was extremely painful. Many of the injuries occurred from the force of the rape and sodomy, and could have individually caused death.

Appellant's defense was that he did not kill, rape or sodomize the victim. We do not find a manslaughter instruction to have been reasonably warranted by the evidence. Consequently, the trial court did not abuse its discretion.

■■■■ Appellant argues that the instruction to the jury concerning the voluntariness of his statement should have included an explanation of what effect a finding of involuntariness would have on other evidence and also that juveniles are presumptively inexperienced and highly vulnerable to suggestion and intimidation.

Again, the trial court gave essentially the Uniform Jury Instruction concerning the voluntariness of his statement and followed the guidelines of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Appellant cites no authority that requires the additional charges. We find the instruction given the jury to be a correct statement of the applicable law and that the trial court did not abuse its discretion. *Tate*, supra.

Finally, appellant contends his conviction should be reversed by reason of an accumulation of error. Not having previously found error, an accumulation thereof has not resulted. *Black v. State*, 664 P.2d 1054 (Okl.Cr.1983).

Finding no error warranting reversal or modification, judgment and sentence is AFFIRMED.