Dewey George MOORE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–85–668.

Court of Criminal Appeals of Oklahoma.

Jan. 17, 1990.

Rehearing Denied April 6, 1990.

Pete Gelvin, Asst. Appellate Public Defender, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., Tomilou Gentry Liddell, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge:

Dewey George Moore, the appellant, was tried by jury and convicted of First Degree Malice Aforethought Murder (21 O.S.1981, § 701.7) (Count I), and Kidnapping (21 O.S. 1981, § 741) (Count II), After Former Conviction of Two or More Felonies (21 O.S. 1981, § 51) in Oklahoma County District Court, Case No. CRF–84–4758, before the Honorable James L. Gullett, District Judge. The jury found three aggravating circumstances, and sentenced appellant respectively to death and nine-hundred ninety-nine (999) years imprisonment. We affirm.

Twelve-year-old J.G. was abducted from the Carl Albert Junior High School parking lot in Midwest City after a football game, between 9:00 and 9:30 p.m., on September 27, 1984. She wore a pep club uniform, consisting of a red sweater and a gray skirt, red pony earrings, and was on her period that day. Mrs. Debbie Scarberry, J.G.'s mother, identified State Exhibit 148, which was found in a brown sack on top of Breeden's Grocery Store less than one block from appellant's trailer, as one of the red pony earrings J.G. wore the day she disappeared. Midwest City Detective Bill Howard testified that around 11:00 a.m. on September 28, 1984, J.G.'s body was found lying facedown in a ditch at Tenth and Peebly Road in Harrah, Oklahoma, some ten (10) miles from Midwest City. The victim was clad in a bra, pulled up off her breasts, and panties rolled down below her buttocks. Her body had adhesive and binding marks on her ankles, wrists, thighs and throat. A piece of duct tape was wadded in her hair, and there were abrasions on her neck and face. Detective Howard observed a pattern of dots on J.G.'s upper arm, which matched the pattern on a belt found in a paper sack on the roof of Breeden's Grocery Store, located less than one block from appellant's trailer in Oklahoma City.

Nicky Graham, an investigator for the medical examiner, collected hairs and fibers which appeared to be held to the body by adhesive. He placed the evidence in envelopes, which he turned over to Deputy David Williams, of the Oklahoma County Sheriff's Office. Dr. Chaik Choi, medical examiner, conducted an autopsy on the victim and determined the cause of death to be asphyxia by strangulation and possibly smothering. Dr. Choi took head and pubic

hair samples, did a pubic hair combing, removed duct tape matted in the scalp hair, and fibers and hairs, which were turned over to Deputy Williams.

Grace Comes, a spotter at the football game, testified that about 9:30 p.m. on September 27, 1984, after the game in Midwest City, while parked outside the locker room, she heard a car horn blowing, saw five cars backed up in traffic, and said the yellow car looked like the pictures of appellant's car depicted in State Exhibits 66 and 67. Paulo Gomes, a football player, was running by the parking lot after the game when he saw a man with a mustache, cap and vest, grab hold of a girl, who was wearing a pep club uniform and yelling for help, and push her in a yellow car. Gomes first identified appellant as the man he saw that night, but then stated ".... it was kind of dark. I couldn't really tell, but what I've seen looked like him." He later saw appellant ten or twelve times on television. On cross-examination, Gomes denied identifying a different man in a photographic lineup. He responded affirmatively when asked if he was positive appellant was the man he saw that night. When he was recalled for further cross-examination, Gomes admitted he may have picked out appellant in the photo lineup for what he was wearing, and a different person for the build. On redirect, Gomes testified he identified appellant based on what he saw the night the incident took place, and did not rely on what he saw on television.

Mrs. Billy Turner saw a tall heavy set man wearing a blue checked flannel shirt and blue jeans put his arm around a short girl, with short brown hair, wearing a cheerleader costume. She saw the man walk the girl to a yellow car, open the door, put his hand over her mouth, hit her in the face, and push her into the car. Mr. Turner saw a white man put his arm around a girl in a cheerleader uniform, and put her in a yellow car. He thought the man had a mustache and was wearing a cap. The Turners both indicated the yellow car looked like the one depicted in State Exhibits 66 and 67.

Eddie Moore testified his brother, appellant, came to his Midwest City home, located less than one mile from Carl Albert Junior High, around 8:45 p.m. on September 27, 1984. Appellant expressed concern about an outstanding warrant for drunk driving and a new car tag, and left between 9:15 and 9:30 p.m. wearing blue jeans and a light colored long sleeve western shirt. He said State Exhibits 66 and 67 looked like appellant's car. He had given appellant several rolls of duct tape.

Richard Owens testified his 1977 maroon Delta 88 oldsmobile, which had no hub caps, was stolen between 8:00 and 9:00 a.m. on September 28, 1984, while it was parked next door to Breeden's Grocery Store in Oklahoma City. He denied having a pair of gloves in his car. He stated Breeden's Grocery Store was about one-eighth of a mile from Hillcrest Mobile Home Park. Margaret Swanson, Assistant Manager of Hillcrest Mobile Home Park, rented the trailer at 3209 Cragg Drive to appellant on September 5, 1984. At 10:44 a.m. on September 28, 1984, Midwest City Police Officer Joe Tuberville spotted the car reported stolen by Mr. Owens and stopped it. Officer Tuberville identified appellant as the driver of the car. Appellant was read his rights and arrested for larceny of an automobile. State Exhibit 8 showed appellant had a mustache when he was booked on September 28, 1984. Detective Silas Ingle processed the vehicle and found a black pair of men's gloves on the front seat. After determining the gloves did not belong to Mr. Owens, and examining them closer finding part of a hair, Detective Ingle delivered the gloves and hair to Janice Davis with the Oklahoma City Police Department forensic chemist lab. A green cap was taken from appellant at the Midwest City Jail.

Richard Dean testified appellant worked for him from September 5, until September 28, 1984, when appellant arrived at the Midwest City job site between 9:45 and 10:00 a.m. and said he had to quit, because he "had a mild coronary during the night." When Mr. Dean gave appellant his check, appellant appeared "very nervous," "wide eyed," and was driving an older dark col-

ored car that was missing hubcaps, instead of the yellow car he usually drove, which Dean identified as depicted by State Exhibits 66 and 67.

Detective Bill Howard went to the Hillcrest Mobile Home Park in Oklahoma City on September 29, 1984, and, pursuant to a search warrant, led a search of appellant's trailer and his 1976 yellow Buick. Detective Howard observed maroon floor mats in appellant's car, found wadded up duct tape outside the trailer, a partially packed suitcase including folded clothes and toilet articles, and a used kotex under the bed in the master bedroom. Another search of the trailer was conducted pursuant to search warrant on October 4, 1984, when officers seized various fiber samples and earring backings in a crack of the couch under the cushions.

James Macon resided at the Hillcrest Mobile Home Park in October of 1984. On Friday, October 5, he walked to Breeden's Grocery Store and saw a brown paper sack on the roof. He first noticed the sack on September 30, 1984. Macon and Tim Baker climbed on the roof and opened the brown sack, which contained several items including used wadded up duct tape, a knife, a belt, a feminine napkin, and cigarette butts. The men called the police who picked up the sack and its contents.

Janice Davis, a forensic chemist with the Oklahoma City Police Department, testified in detail concerning her findings upon analyzing numerous items and concluded in relevant part that: (1) J.G. was blood type O, secretor status unknown; (2) appellant was blood type O and a secretor; (3) the vaginal, anal, oral, and right thigh swabs, as well as the panties and bra, taken from J.G. did not contain any semen; (4) the used sanitary napkin taken from the brown sack on top of Breeden's Grocery contained blood type O, as well as five pubic hairs consistent with J.G.; (5) eight of the eleven cigarette butts taken from the brown sack at Breeden's Grocery were smoked by a secretor with blood type O; (6) a red pony earring front and backing like the one worn by J.G. was found in the brown sack at Breeden's Grocery; (7) two earring back-

ings were found under the cushions on appellant's couch; (8) a hair found on J.G.'s wrist was microscopically consistent with appellant's leg hair; (9) scalp hairs found in the front floorboard and driver's seat of appellant's car were consistent with JG.'s hair; (10) a scalp hair on a used sanitary napkin found under appellant's bed was consistent with J.G.; (11) four scalp hairs found on appellant's bedspread, six scalp hairs found on his bottom sheet, and two scalp hairs found on his topsheet, were consistent with J.G.; (12) several scalp hairs found on an afghan on appellant's couch, on cushion covers, and one scalp hair on the living room floor, were consistent with J.G.; (13) a scalp hair found inside a glove, which was found in the stolen car appellant was driving when arrested, was consistent with J.G.; and (14) ten scalp hairs and thirteen scalp hair pieces found on the duct tape in the brown sack at Breeden's grocery were consistent with J.G.

Ms. Davis divided the fiber evidence into three separate categories: (1) Recent Associations—maroon and gold fibers on J.G.'s foot respectively were like the maroon fibers on the floor mats and the gold fibers on the carpet in appellant's car; (2) Recent Strong Associations—brown/gold fibers from used Kotex in brown sack were like brown/gold fibers in appellant's living room carpet, blue fiber found on duct tape matted in J.G.'s scalp hair and green fiber on her panties, were respectively like blue and green fibers in the afghan on appellant's couch; (3) Recent Extremely Strong Associations—turquoise fibers found on duct tape in J.G.'s scalp hair, on her panties, on her right wrist, on the used Kotex in the brown sack, and wrapped around the scalp hair (consistent with J.G.) on appellant's bed, were all like the turquoise fibers in the afghan on appellant's couch, brown fiber found in J.G.'s pubic combing were like brown fibers in appellant's living room carpet, and red fibers found in appellant's bed, hairbrush, living room floor, and couch, used Kotex and pocket knife in brown sack, and on appellant were like the red fibers in a sample Carl Albert Junior

High Pep Club sweater. (J.G.'s pep club uniform was never recovered.)

Over appellant's objection, Ms. Davis testified that "in my opinion, based on all of this evidence, all of the hairs and serological and all the fibers ... [there] is a positive association. I am convinced that [J.G.] was in Dewey George Moore's living room and in his car." (Tr. VI, at 1259)

The State rested. Appellant presented evidence that the victim was wearing a dark colored reversible jacket the night of her abduction, that her pep club uniform had previously been worn by two other girls, and that four yellow cars with backs shaped like appellant's car were seen at a Carl Albert Junior High football scrimmage on October 31, 1985. The defense rested, and the State presented no rebuttal.

During the second stage, the State admitted appellant's six prior felony convictions: Attempted First Degree Rape–1974; Aggravated Kidnapping and Indecent Liberties With a Child–1976; Assault and Battery With a Dangerous Weapon, Child Beating, and Larceny From a House–1981. Mary Courtney lived with appellant during 1973–74. She testified he was convicted in 1981 for breaking into her house and tying her up. She was afraid of appellant when he was drinking. Her daughter, sixteen-year-old V.C., testified that when she was six years old and her mother was living with appellant in Texas, appellant woke her and her two brothers one night, tied them up nude, and then sat in a chair nude and told them to try to get untied. V.C. also said on another night, she performed fellatio on appellant after he threatened to kill her. Sylvia Dennis, who was married to appellant for seven (7) years beginning in 1964, testified that during that time appellant beat her on numerous occasions, tied her up, choked her, tried to smother her, raped her, almost killed her on three occasions, and beat her children.

Fourteen witnesses testified in mitigation. Elda Moore, appellant's mother, testified appellant suffered from asthma as a child, went to church regularly, attended a military high school for a year, enlisted, and was honorably discharged on medical grounds. Two friends of Ms. Moore testified appellant was friendly and polite. Cathy Baker knew appellant in 1971, when he was a loving and caring person. Elwyn Thurston, a methodist minister who knew appellant from 1967–1971, testified appellant was remorseful for beating and tying up his wife. Betty Depate, whose sister is married to appellant's brother, Eddie Moore, testified she had known appellant for twenty-one years, that Eddie warned her not to leave her children alone with appellant because of his reputation for molesting children, and that appellant was charming when he was not drinking, but was obnoxious when he was drinking. Reverend Robert Winslow of the Wickline United Methodist Church in Midwest City, spoke with appellant while he was in jail pending trial. He said appellant was ministering to cell mates, and his life had meaning. Brenda Moore, appellant's daughter in law, said appellant was pleasant when he was not drinking, that her husband warned her never to be alone with appellant, and that if appellant received a life sentence she would visit him with her husband if her husband wanted her to.

Kim Neal, appellant's niece and a music minister, wrote and visited appellant regularly while he was in jail. Appellant wrote her twenty-six letters, which were admitted to show his spiritual nature. Ms. Neal said appellant had sincerely changed since being in jail, that he made "a definite commitment to God ... he gave his whole heart to God," and that she would visit him often if he received a life sentence. Vaughn Clark, Pastor of the Church Ms. Neal attended, said appellant's religious experience was sincere, that his life was precious to him and would have meaning to other inmates. Eddie Moore, appellant's brother, described the abused childhood he and appellant suffered, and said appellant's life had meaning. Dr. Cecil Burns, a clinical psychologist, diagnosed appellant as having a borderline personality disorder, but not schizophrenic or psychotic, that he tended to lose control under the influence of alcohol or other drugs, that he was physically abused as a child, that he had homosexual feelings, deep feelings of hatred, anger, sexual con-

fusion and bitterness, and while he was drawn to children because he could control them, he was not a pedophile. He said appellant tended to be sexually stimulated by the sight of someone struggling while tied up. According to a 1958 Veteran's Hospital medical report, appellant became a bedwetter when he started school, and his father threatened to tie his penis if he continued. A few days later, it was discovered that appellant had tied his penis with string, causing an infection. Dr. Burns said appellant's mental illness could not be cured at this stage in his life, but appellant could function well in a structured prison environment. On cross-examination, Dr. Burns testified that if appellant was ever released from prison, the chance was good that he would commit criminal acts of violence and constitute a continuing threat to society.

## I.

### PRETRIAL

#### A.

█ In his ninth assignment of error, appellant claims the trial court erred in refusing to grant his motion for change of venue, thus denying him a fair trial before an impartial jury. On February 19, 1985, defense counsel filed a motion for change of venue, brief in support, and four affidavits stating the belief that appellant could not receive a fair trial in Oklahoma County, due to revelations by the news media regarding his prior arrests for other crimes and prior convictions for sex-related offenses. (O.R. 6–16) An article in The Daily Oklahoman on October 10, 1984, detailed appellant's prior criminal record from 1957 to 1984. (O.R. 17–18)

The United States Supreme Court established a two-prong test for appellate review of alleged due process violations due to prior knowledge by jurors and pre-trial publicity in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Prejudice is presumed if "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Id.* at 799, 95 S.Ct. at

2035. *Walker v. State*, 723 P.2d 273, 278 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). This record is devoid of the egregious publicity which pervaded the trials, and resulted in a presumption of prejudice, in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Consequently, the so-called "totality of circumstances" must be examined to determine whether appellant received a "fundamentally fair" trial. *Murphy*, 421 U.S. at 799, 95 S.Ct. at 2036. *See Walker*, 723 P.2d at 278.

█ A careful review of *voir dire* establishes that the trial judge "scrupulously excused those potential jurors who indicated they might not be able to set aside their knowledge or opinions of the crimes and impartially and fairly judge the appellant on the evidence presented at the trial." *Moore v. State*, 672 P.2d 1175, 1177 (Okl. Cr.1983). The trial judge, where appropriate, allowed individual *voir dire* of potential jurors who remembered hearing or reading about the offense as reported by the news media shortly after the crime. Virtually all of the potential jurors who remembered reading or hearing news media accounts of the offense shortly after it happened, could not remember specific details of such accounts at the time of *voir dire*, but only "vaguely" remembered reading or hearing something about the crime after it occurred. Each of the jurors ultimately sworn to try the case stated they could apply the presumption of innocence, and those who read or heard of something about the case stated they could set aside such knowledge and decide the case on the evidence presented in court. Clearly, the lapse in time between the commission of the offense on September 27–28, 1984, the extensive news coverage in early October, 1984, and the beginning of trial on September 3, 1985, "had a profound effect ... on the jury, in softening or effacing opinion." *Patton v. Yount*, 467 U.S. 1025, 1033, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).

None of the jurors who served made any comments which suggested an impartiality that could not be laid aside. *Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2036. The sole potential juror who remembered the most details regarding the news media's account of the crime was individually voir dired. His memory was limited to details concerning where and how the crime occurred. He did not remember anything whatsoever concerning the news media's account of appellant's prior criminal record, and was excused for cause by the trial judge. Appellant has failed to show that the jury selection process permits an inference of actual prejudice. *See Dobbert v. Florida,* 432 U.S. 282, 302–03, 97 S.Ct. 2290, 2302–03, 53 L.Ed.2d 344 (1977); *Brown v. State,* 743 P.2d 133, 137 (Okla.Crim.App.1987); *Walker,* 723 P.2d at 278–79. This assignment is without merit.

### B.

In his eleventh assignment of error, appellant makes three arguments challenging the trial court's failure to sustain his motion to quash the search warrants used to obtain forensic evidence admitted against appellant at trial. Two search warrants covering appellant's trailer and car were issued and executed on September 29, 1984. Two additional search warrants were issued and executed on October 4, 1984, authorizing further searches of appellant's trailer and car.

### 1.

■ Appellant first contends the supporting affidavits for the search warrants issued on September 29, 1984, failed to establish probable cause to search appellant's trailer and car.

The affidavit by Detective William Howard, a seven-year veteran of the Midwest City Police Department, recited that twelve-year-old J.G. disappeared around 9:15 p.m. on September 27, 1984, from the Carl Albert Junior High School football stadium. Witnesses observed a white male force a girl of the victim's general description into a yellow car described as a 1975 or 1976 Ford Fairlane or Torino. The victim's body was found around 11:00 a.m. the next morning near Harrah, Oklahoma. Adhesive tape marks found on the victim's ankles, wrists, neck, and upper arms indicated she was bound thereby, and silver or gray duct tape was found in her hair. Dark red or maroon fibers were found on the victim's feet and ankles, and a blue fiber was found on her wrist.

Detective Howard interviewed appellant's brother who stated that appellant was at his residence, located one-half mile from Carl Albert Junior High School in Midwest City, on the evening of September 27, 1984. Appellant left between 9:00 and 9:30 p.m. driving a 1976 yellow Buick Special. Appellant was apprehended driving a vehicle reported stolen in Midwest City on the morning of September 28, 1984. On September 29, 1984, Detective Howard located the yellow Buick Special registered to appellant at his residence in the Hillcrest Mobile Home Park, located one-half mile from Carl Albert Junior High School. Detective Howard observed maroon floor mats in appellant's vehicle which appeared to contain maroon fibers similar to those found on the victim's body. The victim died from manual asphyxiation or suffocation. There were no signs of obvious sexual molestation, but the medical examiner found a substance on the victim's thigh which might be semen. The affidavit then recited several of appellant's prior convictions involving the abduction, choking, and sexual molestation of several minor female victims. In one of the incidents, appellant used gray duct tape, and in a separate incident he abducted a nine-year-old girl by forcing her into his vehicle.

On the basis of the foregoing, Oklahoma County District Judge William Saied issued two search warrants authorizing the police to search appellant's trailer, and his car parked nearby. (O.R. 34–41) Appellant urges the trial court erred in overruling defense counsel's motion to suppress, citing both federal and state constitutional grounds. *See* U.S. Const. amend. IV; Okla. Const. art. II, § 30. We disagree.

The current fourth amendment standard of appellate review, the so-called "totality

of the circumstances" approach, is set forth in *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983):

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' ... '[C]ourts should not invalidate warrant[s] by interpreting affidavit[s] in hyper-technical, rather than a commonsense, manner.' '[S]o long as the magistrate had a substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. (citations omitted)

In *Gates,* a majority of the United States Supreme Court abandoned the more rigid two-pronged test developed in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332.

Because of its "strong preference" for search warrants issued by a neutral and detached magistrate, the United States Supreme Court has "declared that 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.'" *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) (Quoting *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965)). We hold that the affidavit provided the issuing magistrate with a substantial basis for determining the existence of probable cause. *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332. Thus, appellant's fourth amendment claim is meritless.

■ Turning to appellant's claim under article II, section 30 of the Oklahoma Constitution, we note that two members of this Court recently rejected the *Gates* standard of review for purposes of a state constitutional claim. *Merry v. State,* 766 P.2d 1377, 1379 (Okl.Cr.1988). Thus, we must apply the *Aguilar–Spinelli* standard. *Id.* Specifically, appellant claims the search warrant is invalid because the affidavit es-

tablishes "nothing beyond mere conclusion." *Brief of Appellant,* at 58. He cites *McCann v. State,* 504 P.2d 432, 435 (Okl. Cr.1972), for the proposition that a magistrate should not accept mere conclusions, and that a simple assertion of police suspicion is not alone sufficient to establish probable cause. While we agree with the rule, we do not find it applicable here. Having reviewed the specific facts recited in the affidavit, and summarized above, we find the affidavit sufficient. *See Hines v. State,* 684 P.2d 1202, 1204 (Okl.Cr.1984); *Sockey v. State,* 676 P.2d 269, 270–71 (Okl. Cr.1984). This case does not involve a question concerning the reliability or credibility of an undisclosed informant, such as was presented in the *Aguilar* and *Spinelli* cases. *See McCann,* 504 P.2d at 434; *Luker v. State,* 504 P.2d 1238, 1240 (Okl.Cr. 1972). This claim is meritless.

2.

■ Appellant next contends the language in the warrants authorizing seizure of "clothing and other garments including but not limited to" stated items, "any men's clothing containing fibers colored blue or red" and "items containing traces of any of the preceeding articles" improperly authorized a general search. We disagree.

The search warrants authorized police to search appellant's trailer and car for the following:

> Blood, semen, saliva, p[h]ysiological fluids & secretions, hair, fibers, fingerprints, clothing and other garments including but not limited to: a girl's pep club uniform maroon and gray in color, a black nylon quilted jacket with reversible side gray, blue girl's lace-style tennis shoes; red bloomer pants, white socks with letters "C.A." on them, any tape including but not limited to tape over one inch in width silver or gray in color, any men's clothing containing fibers colored blue or red, a key on a novelty key ring made to resemble a thong-type or sandal shoe, items containing traces of any of the preceeding articles....

(O.R. 36)

To ensure that a search does not extend beyond its authorized purpose and that law

enforcement officers do not engage in exploratory rummaging through personal belongings, a search warrant must describe with specificity and particularity the place to be searched and the items to be seized. *Caffey v. State,* 661 P.2d 897, 900–01 (Okl. Cr.1983). *See U.S. Const.* amend. IV; *Okla. Const.* art. II, § 30. Professor Wayne LaFave, a leading authority in this area, has stated:

> A greater degree of ambiguity will be tolerated when the police have done the best that could be expected under the circumstances, by acquiring all the descriptive facts which reasonable investigation of this type of crime could be expected to uncover and by ensuring that all of those facts were included in the warrant ... A more general type of description will be sufficient when the nature of the objects to be seized are such that they could not be expected to have more specific characteristics....

2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a), at 238–39 (2d ed. 1987) (footnotes omitted). "[A] description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Blum,* 753 F.2d 999, 1001 (11th Cir.1985) (citing *United States v. Wuagneux,* 683 F.2d 1343, 1349 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983)). Under the circumstances of this case, we believe "the warrant described the items to be seized with as much exactitude as was possible at that stage of the investigation ... and sufficiently limited the discretion to be exercised by the officers in conducting the search." *People v. Wolski,* 83 Ill.App.3d 17, 38 Ill.Dec. 297, 302, 403 N.E.2d 528, 533 (1980). In *Wolski,* the broad authorization to seize "articles of clothing with blood or male or female secretions thereon," was held not to constitute a general warrant. *Id.* Here, there is nothing to indicate that the clothing or garments could have been described with any greater degree of particularity. Thus, the warrant was as "specific as the nature of the activity under investigation permit[ted]" in this case. *Blum,* 753 F.2d at 1001. The particularity

requirement must "be applied with a practical measure of flexibility and only requires reasonable specificity." *United States v. Shoffner,* 826 F.2d 619, 630–32 (7th Cir.1987).

Unlike *Kinsey v. State,* 602 P.2d 240, 242 (Okl.Cr.1979), where the challenged language of the search warrant was not limited to the offense outlined in the warrant but authorized seizure of evidence of separate and distinct offenses, in the case at bar, the language challenged by appellant is limited to the offenses outlined in the warrant by the specific list of items preceding it. *See Andresen v. Maryland,* 427 U.S. 463, 480–82, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976). When the challenged language is read in context of the list of items to be seized, it clearly is limited to evidence relating to the kidnapping and murder of J.G., and not some other crime. *Id. Andresen* rejected the defendant's claim that certain warrants "were rendered fatally 'general' by the addition, in each warrant, to the exhaustive list of particularly described documents, of the phrase 'together with other fruits, instrumentalities and evidence of crime at this [time] unknown.'" *Id.* at 479, 96 S.Ct. at 2748.

Concerning appellant's reliance on *Fletcher v. State,* 735 P.2d 1190, 1193–94 (Okl.Cr.1986), we find the instant case distinguishable. Unlike *Fletcher,* this case does not involve questions regarding the issuing magistrate's signing of both warrants, nor does it depend upon the reliability of an informant. Further, the two places to be searched, appellant's trailer and car, were in close proximity to each other.

### 3.

Finally, appellant claims that evidence subsequently seized from his car and trailer pursuant to a warrant issued on October 4, 1984, were the fruits of the prior illegal search and seizure conducted on September 29, 1984. Insofar as we have upheld the validity of the September 29, 1984, search pursuant to warrant, this claim must fail.

## II.

## JURY SELECTION

■ In his fifth assignment, appellant argues the trial court erred in excusing venireman Parrish for cause during voir dire without allowing defense counsel an opportunity to rehabilitate him. A prospective juror may be excused for cause because of his or her views on capital punishment if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The record reveals the dialogue between the trial judge and venireman Parrish as follows:

THE COURT: Mr. Parrish, I will ask you, the defendant in this case is charged with murder in the first degree. It is your duty to determine whether ... [he] ... is not guilty or guilty ... The law provides that the punishment for murder in the first degree is life or death. If you find beyond a reasonable doubt that the defendant is guilty of murder in the first degree, *can you consider both legal punishments, life or death?*

MR. PARRISH: *No.*

THE COURT: Let me ask you this question, sir. If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if, under the evidence, facts and circumstances of the case, the law would permit you to consider a sentence of death, *are your reservations about the death penalty such that regardless of the law, the facts and circumstances of the case, you would not consider inflicting the death penalty?*

MR. PARRISH: *Yes.*

(Tr. I, at 60–61) (emphasis added). The State moved to excuse the venireman for cause, and defense counsel requested an opportunity to rehabilitate the potential juror.

The trial judge's questioning established that potential juror Parrish would not consider imposing the death penalty in a proper case, and thus he was properly excluded

under the standard enunciated in *Witt*. Having reviewed defense counsel's offer of proof concerning the questions he intended to ask, we find that further questioning may only have resulted in confusion. *See Banks v. State*, 701 P.2d 418, 423 (Okl.Cr. 1985). The relevant questions had been asked and clearly answered. *Id.* Therefore "it was not error to deny defense counsel further examination." *Stouffer v. State*, 738 P.2d 1349, 1361 (Okl.Cr.1987). Having found no abuse of discretion by the trial judge, this assignment is meritless.

## III.

## GUILT–INNOCENCE

### A.

In his first assignment of error, which is divided into four subpropositions, appellant challenges the trial court's admission of expert testimony by Ms. Janice Davis, a forensic chemist with the Oklahoma City Police Department.

### 1.

■ Appellant first claims the trial court erred in qualifying Ms. Davis as an expert witness. A witness may be "qualified as an expert by knowledge, skill, experience, training or education...." 12 O.S.1981, § 2702. "The decision as to the sufficiency of the qualifications of an expert witness is within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *Diaz v. State*, 728 P.2d 503, 514 (Okl.Cr.1986).

Ms. Davis testified she has worked for the Oklahoma City Police Department as a forensic chemist for the past six years. Prior to that, she was employed as a forensic chemist with the Oklahoma State Bureau of Investigation for four and one-half years. She received a Bachelor of Science Degree in Chemistry from Central State University, with minors in Biology and Physics, in 1975. She attended seminars on forensic science, including training at the Federal Bureau of Investigation Academy in Quantico, Virginia, on hair and fiber analysis, in 1980 and 1985. She also at-

tended a seminar in Oklahoma City in 1985 on identification of fibers and use of the polarized microscope, taught by FBI Special Agent Howard Edmond. We cannot say the trial court abused its discretion in allowing Ms. Davis to be qualified as an expert witness. *See Farris v. State,* 670 P.2d 995, 997–98 (Okl.Cr.1983); *Barnhart v. State,* 559 P.2d 451, 458 (Okl.Cr.1977).

### 2.

■ Appellant next contends the trial court erred in permitting Ms. Davis to give expert opinion testimony based upon data and procedures that have not gained general acceptance in the scientific community. Appellant relies on 12 O.S.1981, § 2703 for the first time on appeal. He also cites *Driskell v. State,* 659 P.2d 343, 356 (Okl.Cr. 1983), which held that "[s]cientific evidence 'must be sufficiently established to have gained general acceptance in a particular field....' " (Quoting *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923)). The *Driskell* case upheld the admission of microscopic comparison of fiber evidence by analogizing it to microscopic comparison of hair samples, noting that a majority of the jurisdictions which have addressed the issue allow such testimony. *Id.* at 355–56. *See generally* Annot., 23 A.L.R. 4th 1199– 1263 (1983). The admission of expert testimony on microscopic comparison of hair and/or fiber samples has been implicitly, if not explicitly, approved. *See Brown v. State,* 751 P.2d 1078, 1079–80 (Okl.Cr. 1988); *Webb v. State,* 746 P.2d 203, 207 (Okl.Cr.1987); *Johnson v. State,* 731 P.2d 993, 1007 (Okl.Cr.1987); *DeVooght v. State,* 722 P.2d 705, 712 (Okl.Cr.1986); *Jones v. State,* 660 P.2d 634, 636 (Okl.Cr. 1983).

We first address admission of the fiber comparison evidence, about which appellant specifically complains of Ms. Davis' (1) use of a written summary; (2) categorization of the fiber evidence into "Recent Associations," "Recent Strong Associations" and "Recent Extremely Strong Associations"; (3) use of pep club uniforms from a local sporting goods store and from a Carl Albert Junior High student for known fiber references; and (4) failure to conduct dye or gas chromatography testing.

Only the first contention was preserved for appellate review with a timely specific objection at trial, and thus, we will not address the other claims. *See* 12 O.S.1981, § 2104(A)(1); *Wolfe v. State,* 736 P.2d 546, 547 (Okl.Cr.1987). Appellant objected at trial that the summaries improperly overemphasized Ms. Davis' testimony, and thus this is the only objection we will consider. *See Fitchen v. State,* 738 P.2d 177, 180 (Okl.Cr.1987). During the period of time that Ms. Davis testified concerning her evaluation of the fiber evidence, each juror was given a written summary which was utilized solely for the limited purpose of assisting the jurors in following Ms. Davis' analysis of the extensive fiber evidence. The summaries were not admitted into evidence or taken to the jury room. (Tr. V, at 1069; Tr. VI, at 1251–1259) We find the written summary of the extensive fiber evidence in the case at bar assisted the trier of fact by illustrating and explaining Ms. Davis' expert testimony. *See McCormick on Evidence* § 213, at 669 (E. Cleary 3d. ed. 1984). On this record, we reject appellant's contention that undue emphasis was placed on that portion of the evidence. *McCormick, supra,* § 217, at 681. *Cf. Brassfield v. State,* 719 P.2d 461, 462–63 (Okl.Cr.1986) (jurors' limited use of transcript during playing of tape recording not error).

Concerning admission of hair comparison evidence, appellant specifically complains that Ms. Davis failed (1) to collect a minimum of fifty (50) known reference hairs from each region of the body sought to be compared as well as the scalp; (2) to acknowledge the limits of human hair comparisons; (3) to eliminate other possible origins of hairs found in appellant's trailer; and (4) improperly collected hairs by vacuuming.

Again, the foregoing issues are not properly before us, due to the lack of timely specific objections at trial. *See* 12 O.S. 1981, § 2104(A)(1); *Wolfe,* 736 P.2d at 547. Moreover, questions concerning the procedures and conclusions drawn from Ms.

Davis' microscopic comparison of hair and fiber samples were properly raised on cross-examination, and it was the province of the jury to determine the weight to be given to Ms. Davis' testimony. *See Driskell,* 659 P.2d at 356. Accordingly, appellant's complaints are directed at the credibility and weight of the expert testimony rather than its admissibility. Regarding the disturbing allegation by appellant that "Ms. Davis failed to acknowledge the limits of human hair comparisons in her testimony for the State," *Brief of Appellant,* at 65, the record expressly rebuts that contention. During her direct testimony, Ms. Davis stated that microscopic hair comparison can lead to two conclusions, a positive elimination or a finding that the microscopic characterisitics of two hairs are alike and could have originated from the same person. Ms. Davis then stated "... I must stress the fact that it is not a positive identification as you have in a fingerprint ... That is not possible with the technology we have at this time." (Tr. V, at 1158–59) Further, responding to defense counsel's question on cross-examination, Ms. Davis agreed with the following disclaimer on hair comparison reports submitted by the F.B.I.: "It is noted that hair does not possess a sufficient number of unique individual microscopic characteristics to be positively associated with a particular person to the exclusion of all others." (Tr. VI, at 1351)

### 3.

■ Next, appellant asserts the trial court committed reversible error in permitting Ms. Davis to express her opinion that "based on all of this evidence, all of the hairs and serological and all the fibers ... I am convinced that J.G. was in Dewey George Moore's living room and in his car." (Tr. VI, at 1259)

An expert witness "may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts ... The use of opinions is not abolished ... [but it] ... will continue to be permissible for the expert to take the further step of suggest-ing the inference which should be drawn from applying the specialized knowledge to the facts." 1 L. Whinery, *Guide to the Oklahoma Evidence Code* 243 (1985) (Evidence Subcommittee's Note). "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." 12 O.S.1981, § 2704. "Section 2704 must be read ... with Sections 2701, 2702, 2703 and 2403 ... [A]n expert ... should be permitted to give his opinion ... even if ... [it] ... embraces an ultimate issue to be decided by the trier of fact, providing it meets the requirement of Section 2702 that the opinion will assist the trier of fact in determining a fact in issue." 1 L. Whinery, *supra,* at 247–48.

An expert witness should not be allowed to express an opinion that a defendant is guilty or innocent, because "the determination of the defendant's guilt or innocence is solely a question for the trier of fact." *State v. Carlin,* 40 Wash.App. 698, 700 P.2d 323, 325 (1985). *See Gabus v. Harvey,* 678 P.2d 253, 255 n. 2 (Okl.1984). Although Section 2704 abolished the "ultimate issue" rule, Sections 2701, 2703, and 2403 should operate to bar admission " 'of opinions which would merely tell the jury what result to reach....' " 1 L. Whinery, *supra,* at 254 (Evidence Subcommittee's Note).

While it would have been more accurate for Ms. Davis' to state that J.G.'s presence in appellant's car and trailer was consistent with the forensic evidence, *see United States ex rel. DiGiacomo v. Franzen,* 680 F.2d 515, 519 (7th Cir.1982), we do not believe her opinion was an improper expression of guilt or innocence so as to constitute reversible error. Although it may be "permissible for the expert to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts," 1 L. Whinery, *supra,* at 243, it is improper for a forensic expert to state an opinion with absolute certainty where such is beyond the present state of the art of forensic science. *See McCarty v. State,* 765 P.2d 1215, 1218–19 (Okl.Cr.1988). Our conclusion that Ms. Davis' imprecise opinion

did not constitute reversible error is buttressed by the fact that she stressed to the jury the state of the art limitations of her forensic examination. *See Webb v. State,* 746 P.2d 203, 207 (Okl.Cr.1987). Ms. Davis did not improperly express a specific probability that appellant committed the offense. *See Brown v. State,* 751 P.2d 1078, 1080 (Okl.Cr.1988). Finally, we note that the trial court specifically instructed the jury to determine for itself what weight or value to give to the expert witness, and not to surrender its own judgment. (O.R. 142).

### 4.

Appellant lastly contends the trial court erred in admitting the forensic testimony where its probative value was substantially outweighed by its prejudicial effect, was confusing, and misled the jury. Appellant essentially reurges his prior arguments, making an objection under 12 O.S.1981, § 2403, which should have been made at trial, and not for the first time on appeal. *See* 12 O.S.1981, § 2104(A)(1); *Wolfe,* 736 P.2d at 547. This assignment is meritless.

### B.

■ In his second assignment, appellant claims the evidence was insufficient to show malice aforethought or that he killed, attempted to kill, or intended that a killing take place. The State presented both direct and circumstantial evidence, and therefore we believe the proper standard of review is whether any rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt. *See Spuehler v. State,* 709 P.2d 202, 203–04 (Okl.Cr.1985). A reviewing court must accept all reasonable inferences and credibility choices that tend to support the verdict. *See Washington v. State,* 729 P.2d 509, 510 (Okl.Cr.1986). The medical examiner's testimony, detailing the bruises and scratches to J.G.'s neck including a bruised larynx, indicated that the perpetrator strangled her to death by hand. Having reviewed the record, we believe the State presented sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that appellant deliberate-

ly intended to kill the deceased. *See Jones v. State,* 660 P.2d 634, 636–37 (Okl.Cr. 1983). Thus, this is not a case within the rule of *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982), cited by appellant, holding that the Eighth Amendment prohibits imposition of the death penalty upon a person "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." This assignment is without merit.

### C.

■ In his fourth assignment, appellant claims the State failed to establish a sufficient chain of custody to admit State exhibits taken from appellant's trailer, car, and the bag found on the roof of Breeden's Grocery. He cites testimony indicating that a window on his trailer was found open between the time of the two searches, and that there were thunderstorms during the week the bag was discovered. Considering the nature of the articles, the circumstances surrounding their preservation, and the likelihood of contamination, altering or tampering, we cannot say the trial court abused its discretion in admitting the exhibits. *See DeVooght v. State,* 722 P.2d 705, 712–13 (Okl.Cr.1986). Doubts concerning the preservation of the exhibit go to its weight, and not its admissibility. *Fixico v. State,* 735 P.2d 580, 582 (Okl.Cr.1987). This assignment is without merit.

### D.

■ In his sixth assignment of error, appellant argues the trial court abused its discretion it admitting State Exhibit 42. This photograph accurately depicted the cuts and abrasions on the face of the deceased, corroborated the testimony of the medical examiner, and was not unduly gruesome. We cannot agree that its admission constituted an abuse of discretion. *See* 12 O.S.1981, § 2403; *Castro v. State,* 745 P.2d 394, 403 (Okl.Cr.1987); *DeVooght,* 722 P.2d at 713.

### E.

In his seventh assignment of error, appellant claims that comments by the prosecutor deprived him of a fair trial. In the absence of fundamental error, we will not consider the comments not objected to at trial. *See Huntley v. State*, 750 P.2d 1134, 1136 (Okl.Cr.1988). We agree the prosecutor should not have attempted to evoke sympathy for the victim by asking whether the parents of the deceased could ever visit her, in response to statements by relatives of appellant regarding prison visitation. *See Stewart v. State*, 757 P.2d 388, 396 (Okl.Cr.1988). Nor do we believe it was proper for Mr. Macy to comment that "the Judge is the only one in the courtroom [defense counsel] hasn't accused of being a crook." *See Black v. State*, 663 P.2d 22, 25 (Okl.Cr.1983). Defense counsel's objections to the foregoing two comments should have been sustained, and the jury admonished to disregard them. However, while some of the prosecutors' remarks are not to be condoned, we do not believe they were so grossly improper as to warrant reversal or modification. *See Castro*, 745 P.2d at 402; *Fisher*, 736 P.2d at 1009.

### F.

In his supplemental pro se brief, appellant contends he was denied effective assistance of counsel at trial, because trial counsel failed to conduct a prompt investigation, failed to move for funding of defense experts, failed to have a meaningful attorney-client relationship with appellant, and failed to keep out his prior criminal record during the first stage of trial. Appellant has failed to support each of his allegations with relevant citations of authority, and appropriate references to the record. 22 O.S.1981, Ch. 18, App., *Rules of the Court of Criminal Appeals*, Rule 3.5(A) & (C). Appellant has not shown a right to, nor substantial prejudice resulting from the lack of, expert assistance. *See Munson v. State*, 758 P.2d 324, 330 (Okl. Cr.1988). Appellant had no right to appear partially pro se and partially by counsel. *See Peters v. State*, 727 P.2d 1386, 1388 (Okl.Cr.1986). There is no right to a meaningful attorney-client relationship free from animosity. *See Hale v. State*, 750 P.2d 130, 135 (Okl.Cr.1988). Appellant has failed to meet his burden of demonstrating both a deficient performance and resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Fisher v. State*, 736 P.2d 1003, 1011–14 (Okl.Cr.1987).

### IV.

### PUNISHMENT

### A.

In his third assignment, appellant claims the trial court erred by instructing the jury not to allow sympathy, sentiment, or prejudice to enter into its deliberations, and by refusing his requested instruction. We reject this contention for the reasons given in *Fox v. State*, 779 P.2d 562, 574–5 (Okl.Cr. 1989), adopting the Fifth Circuit's decision in *Byrne v. Butler*, 847 F.2d 1135 (5th Cir.1988).

### B.

In his eighth assignment of error, appellant urges his death sentence is invalid because the "heinous, atrocious, or cruel" aggravating circumstance has been interpreted in an arbitrary manner.[1] In *Stouffer v. State*, 742 P.2d 562, 563 (Okl. Cr.1987) (Opinion on Rehearing), we agreed with the Tenth Circuit's conclusion in *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987), *aff'd, Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), that our past construction of the "especially heinous, atrocious, or cruel" aggravating circumstance was unconstituionally vague. *Stouffer* expressly limited this aggravating circumstance to cases where there is evidence that the death of the victim was preceded by torture or serious physical abuse. *Stouffer*, 742 P.2d at 563.

---

1. While this writer agrees with appellant's assertion, see *Foster v. State*, 779 P.2d 591, 594 (Okl. Cr.1989) (Specially Concurring), I yield to the "torture or serious physical abuse" standard as a matter of stare decisis.

During the second stage, the jury was instructed in accordance with Oklahoma Uniform Jury Instruction–Criminal (OUJI–CR) 436 (1981), that the phrase "especially heinous, atrocious, or cruel" was directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse. (O.R. 152) J.G., a twelve-year-old girl, was abducted in a parking lot, hit in the face as she screamed for help, forced in a car, bound by duct tape on her ankles, wrists, thighs, and throat, taken to appellant's trailer where circumstantial evidence indicated he cut her pep club uniform off of her, and ultimately died of asphyxia by strangulation, possibly combined with smothering. When her body was discovered, her panties were rolled down to her thighs, and her bra was pushed up off her breasts. Dr. Chaik Choi, the medical examiner, found scratches and bruises on the victim's face and neck. He said the marks on the neck, including a bruised larynx, indicated the deceased was strangled by hand. Dr. Choi also found various scratches and bruises on the victim's arms, left wrist, right leg and lower back. Applying the *Stouffer* requirement that the death of the victim must be preceded by torture or serious physical abuse, we find the foregoing evidence sufficient to support the jury's finding that the murder was especially heinous, atrocious, or cruel beyond a reasonable doubt. 21 O.S.1981, § 701.12(4). *See Delap v. State,* 440 So.2d 1242, 1257 (Fla.1983).

### C.

■ In his tenth assignment, appellant contends 21 O.S.1981, § 701.9(A), is unconstitutional because it operates to mandate juries to return a death sentence. He makes the novel argument that he was improperly sentenced to death due to the public's perception that so-called "life" sentences do not really mean life, because such inmates remain eligible for parole. He claims jurors who are legitimately concerned about a defendant not being permitted to return to society are left with no adequate alternative except death. Appellant does not, indeed he could not, argue that Section 701.9(A), automatically mandates the death penalty, as it expressly provides for the alternative of life imprisonment. We recognize a State cannot enact a statutory scheme which provides for a mandatory death sentence and fails to allow for individualized consideration of mitigating factors. *See Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). Clearly, Oklahoma's death penalty scheme does not fall within such a prohibition. An Oklahoma jury must choose between death or life imprisonment, 21 O.S. 1981, § 701.9(A), must find at least one aggravating circumstance prior to imposing a death sentence, 21 O.S.1981, § 701.11, and must consider any mitigating circumstances presented by the defendant, 21 O.S. 1981, § 701.10. Here, each juror stated he or she could consider both possible punishments, found the existence of three aggravating circumstances, and that mitigating did not outweigh aggravating circumstances.

## V.

### MANDATORY SENTENCE REVIEW

#### A.

■ Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance. *See Munson v. State,* 758 P.2d 324, 335 (Okl.Cr.1988).

#### 1.

Having reviewed the record, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C)(1).

#### 2.

Appellant's six prior felony convictions, most of which necessarily involved the use or threat of force or such was supported by second stage testimony, were sufficient to

support the jury's finding that appellant was previously convicted of a felony involving the use or threat of violence to the person. 21 O.S.1981, § 701.12(1). We previously found sufficient evidence to support the especially heinous, atrocious, or cruel aggravating circumstance in Part IV(B). 21 O.S.1981, § 701.12(4). Considering appellant's extensive past criminal record involving various acts of violence, and the testimony by Dr. Cecil Burns, a clinical psychologist, that if released from prison the chance was good that appellant would continue to commit violent criminal acts, we find the evidence sufficient to support the existence of a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, § 701.12(7).

### B.

Two members of this Court hold that proportionality review is no longer necessary. *Smith v. State*, 737 P.2d 1206, 1217 (Okl.Cr.1987). I have compared the sentence imposed herein to previous cases, *see Castro v. State*, 745 P.2d 394, 409–10 nn. 3, 4 (Okl.Cr.1987), including the recent cases of *Mann v. State*, 749 P.2d 1151 (Okl.Cr. 1988), *Hale v. State*, 750 P.2d 130 (Okl.Cr. 1988), *Rojem v. State*, 753 P.2d 359 (Okl. Cr.1988), *Brown v. State*, 753 P.2d 908 (Okl.Cr.1988), *Bromley v. State*, 757 P.2d 382 (Okl.Cr.1988), *Stewart v. State*, 757 P.2d 388 (Okl.Cr.1988), *Munson v. State*, 758 P.2d 324 (Okl.Cr.1988), *McCarty v. State*, 765 P.2d 1215 (Okl.Cr.1988), and *Brennan v. State*, 766 P.2d 1385 (Okl.Cr. 1988), and find the sentence to be proper.

Therefore, the judgments and sentences are AFFIRMED.

BRETT, J., concurs.

LANE, V.P.J., and LUMPKIN, J., concur in result.

JOHNSON, J., recused.

LANE, Vice Presiding Judge, concurring in results:

I concur in the results reached by the majority, including that part of the decision that discusses the appropriateness of the death penalty in this case. However, I do not find that it is now necessary to compare the results of this case with prior decisions and thus perform a proportionality review. I would AFFIRM the trial court.

LUMPKIN, Judge, concurs in result.

I concur that the judgments and sentences in each of the Appellant's convictions should be affirmed.

While I agree that the Appellant's allegations of error regarding the issuance and execution of the search warrants are without merit, I cannot join in the Court's analysis of Appellant's claims under article II, section 30 of the Oklahoma Constitution. The Court ignores our previous decisions in *DeGraff v. State*, 2 Okl.Cr. 519, 103 P. 538 (1909), and *Long v. State*, 706 P.2d 915 (Okl.Cr.1985). In addition, the Court finds that pursuant to the decision in *Merry v. State*, 766 P.2d 1377 (Okl.Cr.1988), the *Aguilar–Spinelli* standard must be utilized in reviewing claims of error concerning state constitutional questions concerning search or seizure questions, but then states that "[t]his case does not involve a question concerning the reliability or credibility of an undisclosed informant, such as was presented in the *Aguilar* and *Spinelli* cases. *See McCann*, 504 P.2d at 434; *Luker v. State*, 504 P.2d 1238, 1240 (Okl.Cr. 1972). This claim is meritless." To ensure a proper review of the issues presented by Appellant the Court should adhere to its previous decisions in *DeGraff, Long, Tosh v. State*, 736 P.2d 527 (Okl.Cr.1987), *Dixon v. State*, 737 P.2d 942 (Okl.Cr.1987), *Morgan v. State*, 738 P.2d 1373 (Okl.Cr.1987), *Foster v. State*, 742 P.2d 1131 (Okl.Cr. 1987), *Payne v. State*, 744 P.2d 196 (Okl.Cr. 1987), and *Lister v. State*, 758 P.2d 831 (Okl.Cr.1988), and review the allegations of error pursuant to the criteria set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A review of the allegations of error and evidence in accordance with the *Gates* standard reveals that the affidavit is sufficient and Appellant's claims relating to the issuance of the

warrants and the subsequent searches are without merit.