Percy Gene STEWART, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–85–351.

Court of Criminal Appeals of Oklahoma.

May 25, 1988.

**390**

Patti Palmer, Deputy Appellate Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen., P. Kay Floyd, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

Percy Gene Stewart, the appellant, was tried by jury and convicted of First Degree Malice Aforethought Murder (21 O.S.1981, § 701.7(A)), in LeFlore County District Court, Case No. CRF–85–68, before the Honorable George McBee, District Judge. During the second stage, the jury found that the appellant had knowingly created a great risk of death to more than one person under 21 O.S.1981, § 701.12(2), and sentenced him to death. We affirm the judgment, and modify the sentence to life.

This case involved a shooting episode which occurred on March 21, 1985, in the home of Jesse McDonald, appellant's stepfather, in Spiro, Oklahoma. According to the state's evidence, Joyce Williams, the decedent, received a phone call from her sister, Ms. LaFaye Adams, who was crying and upset and asked the decedent to come see her. Ms. Adams worked for the Department of Human Services as a provider, and lived in the McDonald home. Walter Jones, McDonald's brother-in-law, Doug Jennings, and McDonald were playing cards when Alex Williams dropped off his wife, Joyce Williams at the McDonald residence around 2:00 p.m. At that time, Jennings left with Mr. Williams and stopped a few blocks away at Jennings' house to talk outside. Sometime later, while Ms. Williams and Ms. Adams were in the kitchen, appellant arrived, gave McDonald a pint of whiskey as a gift, walked into the kitchen, and started talking to Adams. McDonald could not hear what was being said, but after hearing what sounded like a gun fall to the floor, he heard sounds of people scuffling. According to McDonald, appellant raised his arm with a pistol in his hand and shot Ms. Adams once, and then came into the front room and "reached up and shot" Ms. Williams. McDonald testified that he was not more than three (3) or four (4) feet away from appellant, when he saw appellant shoot Williams. Shortly thereafter, appellant shot Mr. Jones in the arm, and then fled. Appellant was apprehended

a short time later some four (4) blocks from the McDonald residence in a field near the Cook residence. Alice Cook testified that appellant ran to her house, said he was in trouble, and asked her husband for some bullets. She saw a gun in appellant's hand as he was leaving.

Ms. Adams testified that appellant had beaten her up about a week before the shooting, that she had filed a complaint against him, that he was picked up and taken to jail, and that thereafter she and Mr. McDonald filed a petition for a protective order to keep appellant away from the McDonald residence. After seeing appellant in the house, Adams went to her bedroom and picked up a loaded twenty-two (.22) pistol, which she had obtained after being beaten by appellant. Adams went back to the kitchen and, when Ms. Williams saw the gun, Williams took it and put it in her purse. Shortly, appellant confronted Ms. Adams in her bedroom, and Ms. Williams came up behind appellant with her purse in her hand. According to Adams, she asked Ms. Williams to give her the gun out of the purse and, when the appellant knocked the purse to the floor, a struggle ensued over the gun. Adams said that appellant ended up with the gun and, a few minutes later, appellant shot Adams in the upper abdomen.

Deputy Court Clerk Ramona Browning identified State Exhibits Nos. 6–8, as copies of a petition, *ex parte* emergency order, and final protective order, which were filed respectively on March 7, 8 and 14, 1985, listing Jesse McDonald as the petitioner and appellant as the respondent. Chief Medical Examiner Dr. Robert Hemphill testified that the cause of Ms. Williams' death was massive internal hemorrhaging caused by a gunshot wound which perforated the aorta artery. Dr. Hemphill said that the bullet he removed from the decedent's body was consistent with a .22 caliber.

Carl Butler, who was in jail with appellant before the homicide when appellant was confined on a charge of assault and battery upon Adams, testified that appellant told him he would get rid of the people who had him put in jail. Butler said that after the homicide, appellant told him that he had "got them back." Butler had a prior felony conviction for kidnapping.

Appellant testified that before the shooting incident he had been dating Ms. Adams on a regular basis, that on March 21, 1985, he went to the McDonald residence to tell his stepfather that he was leaving town, and that when he heard crying he went through the kitchen and saw Adams crying and the decedent shaking her. Appellant said that when Joyce Williams, the decedent, took a gun out of her purse, he grabbed her by the hand and, as he twisted her hand, the gun discharged and fell to the floor. Appellant picked it up, tried to get out the back door but could not, fired one shot toward Adams, started towards the front door, fired another shot at someone coming to the front door, and then fled out the back door. He said he did not know Adams was at the McDonald residence until he heard the crying, that he did not intend to shoot or kill anyone that day, and that he did not find out anyone had been shot until he was arrested. On cross-examination, appellant admitted asking for bullets at the Cooks' house because he "figured that somebody was coming behind me." He denied making any threats while he was in jail, and stated that the protective order arose out of an incident when "Adams got drunk, and tried to attack me, and I hollered and slapped her."

During the second stage, the only additional evidence presented by the state was the testimony of Alex Williams, who testified he told appellant he would have come and got appellant out of jail, but he was afraid appellant might have hurt Adams. According to Williams, appellant responded: "You're right ... If you'd have gotten me out ... I'd have went down there and killed all them son-of-a-bitches."

## I.  ISSUES RELATING TO JURY SELECTION

### A.

■ In his sixth assignment of error, appellant urges that the trial court abused its discretion in dismissing venireman

Couch for cause. Under *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the current standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. The bias of a potential juror need not be proved with "unmistakable clarity." *Id.* Voir dire examination revealed that Ms. Couch's son was currently imprisoned after having been prosecuted by District Attorney Ray Edelstein, and convicted of manslaughter some sixteen (16) months prior to appellant's trial. Mr. Edelstein was the prosecutor in appellant's case. Attorney Mike Sullivan had represented Ms. Couch's son, and was court-appointed to represent appellant. While being questioned concerning her son, Mrs. Couch became distraught and started crying. When asked whether her son's situation would "somehow prevent you from being fair in this type of case?" Couch responded: "To be honest with you I'm afraid it would." Ms. Couch responded affirmatively when asked whether the case would create emotional turmoil for her, because of her son. When the State challenged Couch for cause, the trial judge stated that he wanted to give both sides a chance to voir dire Couch before he made his ruling. As voir dire continued, the prosecutor asked Ms. Couch whether she could "fairly consider the alternative of death as a sentence?" She responded, "I don't think I could." When the prosecutor said, "you've told me that you could not consider the imposition of the death sentence; is that correct?," Ms. Couch responded, "That's right." Following voir dire by appellant's counsel, the trial court specifically found that Ms. Couch evinced a state of mind in reference to the case which satisified the court that she could not try the issue impartially. *See* 22 O.S.1981, § 659(2). Based on the foregoing, we cannot say that the trial court abused its discretion in excusing Ms. Couch for cause. *See Walker v. State*, 723 P.2d 273, 280 (Okla.Crim.App.1986).

### B.

■ Appellant claims in his eighth assignment that fundamental error occurred when the trial court failed to *sua sponte* excuse prospective juror Francis for cause, because Francis indicated during questioning that he favored the death penalty for any unjustified killing. Francis stated: "Well, I believe if you take another man's life it ought to be the death penalty." (Tr. II 218) Francis further said that the death penalty would not be appropriate where the killing was in self-defense. He stated he would follow the presumption of innocence, and that he would require the State to prove guilt beyond a reasonable doubt. Defense counsel passed Francis for cause, and used his remaining peremptory challenges to excuse other potential jurors. "The failure of the trial court to remove a prospective juror who unequivocally states that he is unwilling to follow the law during the penalty phase by considering a life sentence is error." *Ross v. State*, 717 P.2d 117, 120 (Okla.Crim.App.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987). In *Ross*, the prospective juror stated twice that he would automatically vote for the death penalty if he found the defendant guilty of murder. *Id.* When his challenge for cause was denied, defense counsel used a peremptory challenge to remove the prospective juror, and a majority of this Court held that no error occurred since appellant failed to show that an objectionable juror sat on the jury. *Id.* The instant case is distinguishable from *Ross*. Here, it was not established that juror Francis would unequivocally refuse to consider a life sentence. Neither defense counsel nor anyone else found it necessary to ask Francis whether he could consider both possible punishments, that is, death or life imprisonment. Defense counsel passed Francis for cause, and declined to use one of his remaining peremptory challenges to excuse him. Defense counsel has a duty "to examine the jurors on voir dire and discover by proper investigation the facts affecting their qualifications and then to reasonably raise any objection that might exist as to any member of the panel. If he fails to do so, he waives any objection on that point." *Perkins v. State*, 695 P.2d

1364, 1368 (Okla.Crim.App.1985). On the record presented, we cannot say that fundamental error occurred. This assignment is without merit.

### C.

■ In his twelfth assignment, appellant contends that the jury did not represent a fair and impartial cross-section of the community, but was instead unconstitutionally guilt prone. The Court has adopted the United States Supreme Court decision in *Lockhart v. McCree*, 476 U.S. 162, 183–84, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986), which rejected such a position. *See Van-Woundenberg v. State*, 720 P.2d 328, 331–32 (Okla.Crim.App.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). This assignment is without merit.

### II. ISSUES RELATING TO GUILT–INNOCENCE

### A.

In his first four assignments of error, appellant complains of alleged errors in the instructions. These issues were not properly preserved for appellate review, in the absence of timely specific objections and submission of written requested instructions. *See Millwood v. State*, 721 P.2d 1322, 1325–26 (Okla.Crim.App.1986). Accordingly, unless the failure to instruct resulted in a miscarriage of justice or deprived the appellant of a substantial right, there can be no reversible error. *See* 20 O.S.1981, § 3001.1.

### 1.

■ First, appellant urges that the trial court erred in not *sua sponte* instructing the jury that in order to prove malice aforethought first degree murder, the State had to disprove heat of passion beyond a reasonable doubt. The case relied upon by appellant, *United States v. Lofton*, 776 F.2d 918 (10th Cir.1985), is distinguishable. In *Lofton*, the defendant's sole affirmative defense was that she killed her husband in the heat of passion or upon adequate provocation. Here, the appellant's defense was self-defense, the jury was properly instructed thereon, the jury was specifically

instructed to resolve any doubts as to which offense the appellant was guilty of in favor of a lesser charge, and the jury was instructed on heat of passion first degree manslaughter as a lesser included offense. The *Lofton* case simply does not apply here. *See Brewer v. State*, 718 P.2d 354, 365 (Okla.Crim.App.1986). Appellant's reliance on *Morgan v. State*, 536 P.2d 952 (Okla.Crim.App.1975), is misplaced. *Morgan* was recently overruled by a unanimous opinion in *Walton v. State*, 744 P.2d 977, 979 (Okla.Crim.App.1987). This assignment is meritless.

### 2.

■ Regarding the alleged errors in the trial court's failure to *sua sponte* instruct on first degree misdemeanor-manslaughter and second degree manslaughter, in the absence of evidence reasonably tending to prove these lesser crimes, we find no fundamental error. *See Castro v. State*, 745 P.2d 394, 402 (Okla.Crim.App.1987); *Webb v. State*, 732 P.2d 478, 479 (Okla. Crim.App.1987). The case cited by appellant, *Dawson v. State*, 647 P.2d 447, 448–49 (Okla.Crim.App.1982), is distinguishable. Unlike *Dawson*, here there was evidence that appellant had a design to effect death. Finally, we cannot say that the trial court's failure to *sua sponte* instruct on excusable homicide deprived appellant of a substantial right in this case. *See Reynolds v. State*, 617 P.2d 1357, 1360 (Okla.Crim.App. 1980).

### B.

■ In his tenth assignment of error, appellant claims that the trial court erred in giving an instruction on flight. The state presented testimony that the appellant left the scene of the crime, went to the Cook house several blocks away, asked for bullets, and left. Appellate counsel concedes that appellant "admitted running to the Cooks' house following the shootings, but said that he thought he was being followed." Appellant asserts that the flight instruction was highly prejudicial because the circumstances present did not necessarily indicate a consciousness of

guilt or a specific attempt at concealment. Alternatively, appellant claims that the trial court should have given an additional instruction which supported the appellant's testimony "that any flight was done without any consciousness of guilt and only in panic, and that flight was a circumstance which was irrelevant to determination of malice aforethought." We disagree.

After examining the evidence presented at trial concerning appellant's flight from the scene of the shooting, we believe the appropriate rule was succinctly stated as follows:

> Flight of a defendant is a circumstance tending to prove guilt, and where the State offers evidence of the conduct of defendant tending to prove flight, and the defendant offers evidence in explanation of such conduct, it is proper to submit the question of flight to the jury as a matter of fact for their determination, and to instruct them that, if they find beyond a reasonable doubt that the defendant fled, it may be considered as a circumstance tending to prove guilt.

*Padillow v. State*, 501 P.2d 837, 841 (Okla. Crim.App.1972) (Quoting *Bruner v. State*, 31 Okla.Crim. 351, 238 P. 1000 (1925)). As was stated in *Bruner:*

> If the leaving of the scene of the homicide, under the circumstances detailed in the evidence, was a flight, it is admissible as tending to establish the guilt of the defendant. If, on the other hand, the explanation of the defendant was satisfactory to the jury it would have no significance.

*Bruner*, 238 P. at 1002. For the foregoing reasons, we find this assignment is without merit.

### C.

In his fifth assignment of error, appellant claims he was denied effective assistance of counsel because his trial attorney had previously represented Carl Butler, who testified against appellant at trial. Carl Butler testified on behalf of the State that while he was incarcerated on charges of kidnapping and injury to a cemetery, appellant was brought into the jail on a charge of assault and battery. According to Butler, appellant stated he would "get rid of" the people that put him in jail. Shortly thereafter, appellant was released. Butler testified that when appellant was later brought back to jail, appellant said that "he got those people that put him in jail the first time." Butler denied being promised anything in exchange for his testimony. Defense counsel vigorously cross-examined Butler, who said that he was out of jail because the charges pending against him were dropped. On redirect, Butler said that appellant's lawyer represented him on the pending charges. On recross-examination, however, Butler admitted that appellant's counsel was not representing Butler when the pending charges were dropped. The record further reflects that defense counsel extensively cross-examined Butler, and was somewhat successful at impeaching his credibility. Nothing in the record indicates that there was any factual relationship between the charges pending against Butler and the charges pending against appellant. No conflict of interest objection was raised at trial.

"Where defense counsel has represented a principal witness in litigation which has a factual relationship to issues in a pending criminal case, the conflicts principles from cases of multiple representation of defendants apply. *United States v. Winkle*, 722 F.2d 605, 610 (10th Cir.1983)." *United States v. Davis*, 766 F.2d 1452, 1457 (10th Cir.1985), *cert. denied*, 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985). The defendant need not show prejudice to obtain relief, if he can demonstrate that his attorney's previous representation of the witness adversely affected the adequacy of defendant's subsequent representation. *Id.*

Appellant's reliance upon *Winkle* is misplaced. In *Winkle*, defense counsel had previously represented Cox, who was "the principal Government witness in litigation with a factual relationship to some issues in this criminal case." *Winkle*, 722 F.2d at 610. On cross-examination, Cox denied ever having borrowed money from the defendant Winkle. In a bench conference,

defense counsel informed the trial court that he had personal knowledge that Cox had borrowed money from Winkle to pay defense counsel's fee. The issue was important to the credibility of the defendant who claimed that money received from Cox was for repayment on a loan, whereas Cox denied the loans and testified that the money was a payment for drugs sold by the defendant. Also, a serious question of attorney-client privilege was raised, and the discussion of the conflict was discussed at the bench outside the hearing of the defendant. *Id.* at 611. Under such circumstances, the judgment was vacated and remanded for an evidentiary hearing to determine whether a conflict of interest actually existed and adversely affected defense counsel's performance at trial. *Id.* at 611–12.

■ Here, unlike *Winkle*, appellant has failed to show that Butler was a principal state witness in a case with a factual relationship to appellant's case, when Butler was represented by the same attorney who represented appellant. Further, appellant's situation does not present a serious question of attorney-client privilege, nor was the fact that defense counsel had previously represented Butler concealed from appellant by way of a bench conference, as was true in *Winkle*. In addition, appellant's trial counsel did not claim to have personal knowledge contradicting Butler's testimony, as a result of his prior representation of Butler. In short, appellant has made no showing that the adequacy of his representation was adversely affected by his trial attorney's former representation. *Davis*, 766 F.2d at 1457. We conclude appellant has failed to establish a Sixth Amendment violation, since "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). *See Matricia v. State*, 726 P.2d 900, 903–04 (Okla.Crim.App.1986). This assignment of error is without merit.

### D.

■ In his seventh assignment, appellant complains of the admission of other crime evidence concerning his prior assault on LeFaye Adams and State Exhibits 6, 7 and 8, consisting of a petition, and an *ex parte* and final protective order issued prior to the homicide, which contained written allegations that appellant had stolen money from Jesse McDonald and had threatened to harm McDonald and Walter Jones. The trial court issued a cautionary jury instruction that the evidence could not be considered as evidence of guilt, but was received solely on the issue of motive or intent. (O.R. 103) Appellant was not on trial for shooting Adams, and thus it is difficult to understand how appellant's prior assault on Adams was relevant to his motive or intent in shooting Williams, so as to be admissible under 12 O.S.1981, § 2404(B). Surely, the minimal to nonexistent probative value of such evidence was substantially outweighed by the danger of unfair prejudice so as to be inadmissible under 12 O.S.1981, § 2403. Further, our review of the record shows that the prosecution failed to include this evidence in its *Burks* notice (O.R. 26–27), and did not specify the exception at trial under which the evidence was sought to be admitted. *See Burks v. State*, 594 P.2d 771, 774 (Okla.Crim.App.1979). The apparent inclusion of this evidence in the Amended Bill of Particulars (O.R. 41–42) cannot be said to have cured the notice problem, since such notice relates to second stage evidence only. We are hard-pressed to find reversible error, however, where trial counsel failed to make timely specific objections on these grounds at trial. *See* 12 O.S.1981, § 2104(A)(1); *Thompson v. State*, 705 P.2d 188, 191 (Okla.Crim.App.1985). The effect of this error on punishment will be discussed in our mandatory sentence review.

### · E.

■ In his ninth assignment, appellant asserts he was denied a fair trial because of prosecutorial misconduct. Only one of the asserted improper comments was met with a timely specific objection and, in that instance, the objection was

sustained and no admonishment was requested or given. In the absence of timely specific objections, review is limited to fundamental error. *See Brecheen v. State,* 732 P.2d 889, 896 (Okla.Crim.App.1987). The prosecutor's statements during voir dire that beyond a reasonable doubt does not mean "beyond all doubt" or "beyond a shadow of a doubt" were not grossly incorrect, nor can we say the jury was left with an erroneous impression. *Diaz v. State,* 728 P.2d 503, 511 (Okla.Crim.App.1986). However, District Attorney Ray Edelstein engaged in improper argument when he repeatedly told the jury that the appellant had lied (Tr. 629, 647, 649 & 650), and had "rehearsed" and "prepared" his story "in an attempt to muddy the waters, to make a smoke screen...." *See Lewis v. State,* 569 P.2d 486, 488 (Okla.Crim.App.1977). Mr. Edelstein improperly vouched for the credibility of his witnesses by stating "everybody ... who came here to testify when the State presented their case, told you the truth, the best that they could." *See Bechtel v. State,* 738 P.2d 559, 561–62 (Okla.Crim.App.1987) (Parks, J., Specially Concurring). Finally, appellant claims the prosecutor erred when he argued that appellant wrote Defendant's Exhibit No. 2, which was a handwritten account of the shooting. Appellant testified that he saw Carl Butler write the document. Our examination of the record reveals no testimony that appellant wrote Defendant's Exhibit No. 2. Therefore, Mr. Edelstein's remark was improper as it was not based on facts in evidence. *See Thompson v. State,* 462 P.2d 299, 303–305 (Okla.Crim.App. 1969); *Gossett v. State,* 373 P.2d 285, 288 (Okla.Crim.App.1962).

The instant case comes perilously close to falling within the fundamental error rule that the combined effect of the prosecutor's remarks "was so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings and mandate a new trial." *Cobbs v. State,* 629 P.2d 368, 369 (Okla.Crim.App.1981). *See Tobler v. State,* 688 P.2d 350, 353 (Okla.Crim.App.1984). However, in light of the evidence that appellant intentionally shot the decedent, and trial counsel's failure to make timely specific objections, we believe reversal is unwarranted. The effect of the error on punishment will be addressed in our mandatory sentence review.

## III. ISSUES RELATING TO PUNISHMENT

In light of our holding in Part IV(A)(1), we find it unnecessary to address the remaining assignments of error relating solely to punishment.

## IV. MANDATORY SENTENCE REVIEW

### A.

Pursuant to 21 O.S.Supp.1986, § 701.13(C), we are called upon to determine two issues in all capital cases:

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

2. Whether the evidence supports the jury's finding of a statutory aggravating circumstance as enumerated in Section 701.12 of this title.

### 1.

Mr. Edelstein engaged in improper argument during the second stage, by asking the jury to sympathize with the victim: "Where was the sympathy, where was the mercy for Joyce Williams." (Tr. 766–67) *See Tobler v. State,* 688 P.2d 350, 354 (Okla.Crim.App.1984). We have previously found error in the guilt-innocence stage with regard to the admission of other crime evidence (Part II(D)), and improper prosecutorial misconduct during closing argument (Part II(E)), but held that reversal was unwarranted in light of the evidence of guilt, and the failure to make timely specific objections at trial. Nevertheless, we find that the aforementioned errors may have improperly influenced the jury to return a death sentence as the result of passion, prejudice, or some other arbitrary factor under 21 O.S.Supp.1986, § 701.13(C)(1). *See Jones v. State,* 660 P.2d 634, 646 (Okla.Crim.App.1983) (Brett,

J., Specially Concurring, joined by J. Cornish). Our conclusion is further supported by the *Trial Judge's Report:* "Possible doubt of 'Malice aforethought'—shooting could have been out of fear, without intent to kill ... In comparison with other cases, death penalty not appropriate. In court's opinion, Jury would have sentenced Defendant to life without parole if it had option ... It is court's belief Jury was unsure of what 'life imprisonment' really meant in years of actual confinement, and that death sentence did not really mean death." During second stage deliberations, the jury wrote a note to the trial judge requesting the definition of life imprisonment and whether the jury could recommend life without parole. (Trial Ct.Ex. 1) Accordingly, for these reasons, we hold that appellant's death sentence must be modified to life imprisonment.

### 2.

In light of our holding in Part IV(A)(1), it is unnecessary to address whether the State presented sufficient evidence to establish the aggravating circumstance of great risk of death to more than one person.

Based on the foregoing, the judgment is AFFIRMED and the sentence of death is MODIFIED to life imprisonment.

BRETT, P.J., concurs.

BUSSEY, J., concurs in result.