2000 OK CR 20

**Benjamin Charles HARRIS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F 1999–625.**

Court of Criminal Appeals of Oklahoma.

Oct. 23, 2000.

Rehearing Denied Nov. 29, 2000.

John Thomas Hall, Jerry Weiss, Indigent Defense System, Clinton, OK, Attorneys for Defendant at trial.

Dan Deaver, Assistant District Attorney, Jackson County Courthouse, Altus, OK, Christopher Kelly, Assistant District Attorney, Washita County Courthouse, Cordell, OK, Attorneys for the State at trial.

Thomas Purcell, Appellate Defense Counsel, Indigent Defense System, Norman, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, James F. Kelly, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## OPINION

LILE, Judge:

¶1 Appellant Benjamin Charles Harris was convicted of First Degree Murder, 21 O.S.1991, § 701.7, after a jury trial in the District Court of Jackson County, Case Number CF–99–68, before the Honorable Richard Darby, District Judge.[1] In accordance with the jury verdict, Judge Darby sentenced Harris to life without the possibility of parole. From this judgment and sentence Harris has perfected his appeal. After thorough consideration of the propositions on appeal and the entire record before us, including the original record, transcripts, and briefs, we have determined that the judgment and sentence shall be affirmed.

¶2 Harris and A.J. Pearce were close friends, or so everyone believed. On April 21, 1995, the two met in Cordell, Oklahoma and decided to drive around the area. Both were drinking and they were looking for parties to attend.

¶3 Harris was driving his uncle's Ford Bronco II which had a .38 caliber revolver under the drivers seat and a sheath knife in the rear area. According to Harris, he took out the knife to show Pearce, and Pearce placed it between the seats after looking at it. Harris drove to Clinton to get gas and cigarettes and finally arrived at Highway 183 and Crider road, north of Cordell. According to Harris, even though he thought Pearce was asleep, he mentioned that he didn't think it was a good idea for Pearce to date his uncle's ex-wife. After Harris said this, he felt something hit his thigh and saw the flash of a knife. Harris testified that he couldn't remember what happened next until he was calling 911 to tell them that he had just shot Pearce. At trial, during cross-examination, Harris conceded that he shot Pearce intentionally.

¶4 Pearce was shot three times in the side of the head and once in the side of the abdomen with the .38 caliber revolver. He died as a result of the gunshots to the head.

¶5 The State's evidence indicated that Harris cut his own jeans and refuted the fact that a cut to the jeans could have been made by Pearce trying to stab Harris. The State's expert, Tom Bevel, refuted the fact that the shots could have been fired while Harris was sitting in the driver's seat and supported a conclusion that Pearce was asleep and reclined in the passenger seat when he was shot.

¶6 In his first proposition, Harris complains about the introduction of two video reenactments. The first video reenactment shows two live actors recreating the expert witness' theory of the shooting based upon bullet trajectories through the body of the victim and into the seat and the side of the Ford Bronco II. The second video reenactment is a computer animation based upon the trajectory of the bullet passing through the victim's abdomen and into the vehicle seat.

¶7 These video reenactments were used by the State's expert witness Tom Bevel[2] during his testimony to illustrate the State's theory and Bevel's conclusion that the victim was asleep and reclining while he was shot. The video was also used to disprove a theory that Harris was being attacked or that he was driving while he fired the gun.

¶8 Expert testimony is admitted at trial pursuant to the Oklahoma Rules of Evidence, 12 O.S.1991, §§ 2702–2703. In *Taylor v. State*, 1995 OK CR 10, ¶15, 889 P.2d 319, 328–29, we adopted the United States Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for the introduction of expert testimony as it relates to novel scientific evidence.

---

1. This was Harris's second trial on these charges. The first trial resulted in a life sentence, but the conviction and sentence was reversed on appeal, because some jurors had conducted their own experiments in an attempt to understand how this crime was physically committed. (*Harris v. State*, Unpublished Opinion, Case No. F 96–1150, Court of Criminal Appeals, February 27, 1998)

2. This Court has previously recognized Bevel's expertise in the field of blood spatter analysis and crime scene reconstruction. *Slaughter v. State*, 1997 OK CR 78, ¶120, 950 P.2d 839, 871; *Romano v. State*, 1995 OK CR 74, ¶22, 909 P.2d 92, 110; *Robedeaux v. State*, 1993 OK CR 57, ¶22, 866 P.2d 417, 425; *Farris v. State*, 1983 OK CR 141, ¶8, 670 P.2d 995, 997–98.

¶ 9 Recently, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999), the United States Supreme Court explained that the *Daubert* analysis is not limited to "scientific evidence" but shall also be applied to all novel expert testimony introduced pursuant to Rules 702 and 703 of the Federal Rules of Evidence. The *Kumho* analysis is compelling and is a logical and proper extension of the Daubert decision. However, in this case, the "scientific, technical or other specialized knowledge" involved was not novel and has long been recognized as the proper subject of expert testimony.[3]

¶ 10 Experts regularly rely on illustrative aids so that the jury may better understand their testimony. This Court has been reluctant to admit crime scene reenactments where they are posed with persons and things in various assumed situations, intended only to illustrate hypothetical situations. *Robison v. State*, 1984 OK CR 21, ¶ 32, 677 P.2d 1080, 1087; *Langley v. State*, 90 Okl.Cr. 310, 213 P.2d 886, 892–93 (1950); *Roberts v. State*, 82 Okl.Cr. 75, 166 P.2d 111, 117–18 (1946). However, these cases do not deal with situations where relevant evidence supports a scientific or technical hypothesis which is illustrated by the posed reenactment. With advancements in the field of crime scene reconstruction, the widespread use of video, and advances in computer technology, video reenactments and computer aided crime scene reconstruction are making their way into the courtroom in the trial of criminal cases.[4]

¶ 11 The particular illustrative aids at issue here are similar in nature to posed photographs. In *Roberts*, the subject of posed photographs was considered. That opinion quoted extensively from *Wharton's Criminal Evidence*, Eleventh Edition to the effect that,

> There is a decided conflict of authority as to whether or not photographs of an attempted reproduction of the scene of a crime showing posed persons, dummies, or other objects are admissible to illustrate the contention of the party offering them as to the relative positions of the movable objects so represented at the time and place of the crime involved in the prosecution under consideration. Some courts have looked with disfavor upon the admission of photographs of an attempted theory or contention of the party offering them, as recalled by his witnesses, of movable or moving objects. Thus, it was held error to introduce in evidence in a prosecution for murder photographic representations of *tableaux vivants* carefully arranged by the chief witness for the State, intended to exhibit the situations of the parties and the scene of the tragedy according to such witness's account of it. . . . In most jurisdictions where this question of admissibility has arisen, however, the courts have held such photographs admissible, when a proper foundation therefor has been laid by preliminary testimony showing that the objects and situations portrayed are faithfully represented as to position. The holding of these cases has been elucidated by one court, in a case in which it held admissible a photograph of the interior of a saloon in which a shooting occurred showing a group of prearranged figures to indicate the position of the principal parties at the time of the homicide as near as the witness could determine, as follows: 'It has always been permissible to use diagrams in the trial of causes, both civil and criminal, and especially in the latter class to use diagrams, if shown to be correct, to illustrate the position of persons and places, and to better enable the witnesses to properly locate them. If, then, a diagram may be used for such a purpose, we can see no good reason why a photograph may not be. . . .

*Roberts*, 82 Okl.Cr. at 87, 166 P.2d at 117, quoting *Wharton's Criminal Evidence* (11th Ed.), § 773, p. 1317. Nevertheless, this

---

**3.** Title 12 O.S.1991, § 2702 provides,
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training and education may testify in the form of an opinion or otherwise.

**4.** This development is not limited just to criminal cases. *See Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083, 1086 (10th Cir.1994)

Court, in *Roberts,* excluded such posed crime scene reenactments. We believe that, contrary to our holding in Roberts, the better rule to apply to such posed exhibits—when used during expert testimony to illustrate the witness' testimony—should be the same test used for photographic exhibits to determine their admissibility. The trial court should ensure that "they are correct representations of the object portrayed, are relevant, and not unfairly prejudicial." 2 Whinery, *Oklahoma Evidence,* § 22, p. 449 (1994); *Edwards v. State,* 1976 OK CR 199, ¶ 16, 554 P.2d 46, 49; *Parkhill v. State,* 1977 OK CR 128, ¶ 15, 561 P.2d 1386, 1390.

¶ 12 In *Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528 (2000) the South Carolina Supreme Court held that the trial court did not abuse its discretion when it refused to admit a computer-generated video animation.[5] The court reasoned that the animation was inconsistent with the testimony of witnesses and it inaccurately reflected the evidence. The Court set forth guidelines for the admission of computer-generated video animation as demonstrative evidence, based on the South Carolina Rules of Evidence (SCRE):[6]

1. The proponent must show that the animation is authentic, Rule 901, SCRE;
2. next the animation must be relevant, Rule 401 and 402, SCRE, (the animation must be a fair and accurate representation of the evidence to which it relates) and;
3. its probative value must substantially outweigh the danger of unfair prejudice, confusing the issues, or misleading the jury under Rule 403 SCRE.

*Clark,* 529 S.E.2d at 536–38. The South Carolina court went further to say that trial courts "should consider whether the proponent disclosed the animation and underlying data within a reasonable period of time before trial." *Clark,* 529 S.E.2d at 536.

¶ 13 The court also encouraged the giving of a cautionary instruction: "the animation represents only a re-creation of the proponent's version of the event; it should in no way be viewed as the absolute truth; and, like all evidence, it may be accepted or rejected in whole or in part."[7]

5. The South Carolina Supreme Court described and defined a "computer animation" in the following way,

   Computer animation allows attorneys to convert witnesses' verbal testimony into dynamic, visual demonstrations capable of mentally transporting jurors to the scene.... However, a computer animation can mislead a jury just as easily as it can educate them. An animation is only as good as the underlying testimony, physical data, and engineering assumptions that drive its images. The computer maxim "garbage in, garbage out" applies to computer animation.

6. The court in *Clark* also stated "[t]he fact that the animation is inconsistent with testimony or evidence presented by the opposing party should not necessarily lead to its exclusion, provided it fairly and accurately portrays the proponent's version of events." *Clark,* 529 S.E.2d at 537.
   The relevant South Carolina Rules of Evidence are comparable to the Oklahoma Evidence Code. The South Carolina Court also explained that "demonstrative evidence" are items that explain or summarize other evidence and testimony which has secondary relevance-it is not directly relevant, but must rely on other material testimony for relevance. The Court recognized that demonstrative evidence can also have substantive value and may be admissible as an exhibit for the jury to examine and consider during deliberations.

   Computer reconstruction has been classified into two distinct categories: computer animation and computer simulations. *See,* Kristin L. Fulcher, Comment, *The Jury as Witness: Forensic Computer Animation Transports Jurors to the Scene of a Crime or Automobile Accident;* 22 U. Dayton L.Rev., 55, 58 (1996). Animation is merely used to illustrate an expert's testimony while simulations contain scientific or physical principles requiring validation. *Id.* Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids. *Id.* Computer simulations are created by entering data into computer models which analyze the data and reach a conclusion. *Id.* Because the simulations themselves draw conclusions they may have independent evidentiary value. *Id.* As these later computer simulations appear on the scene, the courts will be faced with making the *Daubert* analysis. However, the "computer animation" involved in this case does not require such a review because it was not based on novel scientific, technical or other specialized knowledge, and it merely illustrated the expert witness's testimony. This is not to say that the computer program used to merely display the expert's conclusions here might not be subject to *Daubert* evaluation if its reliability was challenged.

7. There is a very real danger that a jury may believe that they are seeing a repeat of the actual event rather than an illustration of a witness's

¶ 14 The authentication of a computer enhanced video animation, or any other video animation for that matter, can be made by offering testimony from a witness familiar with the animation and the data on which it is based, providing "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Clark,* 529 S.E.2d at 537.

¶ 15 We believe that the South Carolina guidelines represent a model for Oklahoma trial courts. They are nothing more than the standard rules of evidence set forth in our own Evidence Code.

¶ 16 In order for a video or computer crime scene reenactment to be seen by a jury, as an aid to illustrate an experts witness' testimony, the court should require (1) that it be authenticated-the trial court should determine that it is a correct representation of the object portrayed, or that it is a fair and accurate representation of the evidence to which it relates, (2) that it is relevant, and (3) that its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." *See* 12 O.S.1991, §§ 2401–2403, 2901.

¶ 17 The court should give an instruction, contemporaneous with the time the evidence is presented, that the exhibition represents only a re-creation of the proponent's version of the event; that it should in no way be viewed as an actual recreation of the crime, and like all evidence, it may be accepted or rejected in whole or in part. The court must also ensure that the other party has prior opportunity to examine the reenactment and underlying data. The trial court should also mark the video reenactment as a court's exhibit so that the record may be preserved.

¶ 18 In the present case, the video and computer generated reenactments are properly categorized as illustrative or demonstrative aids used to explain the expert's testimony, because they merely give visual meaning and definition to the testimony. They should not have been made available for the jury during deliberations as they have no independent evidentiary value.[8]

¶ 19 In this case however, the videos were made available to the jury, even though they were merely illustrative aids. After the jury requested the video tapes, the trial court informed the jury that the video equipment was set up in the courtroom and they could inform the bailiff if they wanted to view the tapes while deliberating. There is no evidence on the record to show that the jury viewed the tapes during deliberations. Even if the jury had viewed the tapes during deliberations, we are confident that the possible repetitive viewing during deliberations of these particular videos would not have overemphasized the expert's conclusions to the detriment of Harris.

¶ 20 In applying the foregoing guidelines we find that Bevel's testimony accurately depicted the scenes on the tapes. The video and computer aided reenactments were correct representations of the objects and scenes portrayed and the reenactments are fair and accurate representations of the evidence to which they relate. Bevel explained each reenactment as it was played and explained that the reenactments were designed to help him show a hypothesis or conclusion. Therefore, the video and computer generated crime scene reenactments were both authenticated and relevant.

¶ 21 To determine whether the probative value of the reenactments was not "substantially outweighed by the danger of unfair

opinion of what happened. Therefore, when a re-enactment is shown to the jury, it must be made clear that the video is merely a re-creation of the proponent's version of the event. A jury cautionary instruction similar to the one encouraged by the South Carolina Court shall be used, both at the presentation of the re-enactment and in the final instructions, so that the jury is not misled or confused.

8. Making "computer simulations" (discussed in fn. 6), available for the jury to view during deliberations raises a different issue in which the considerations set forth in *Martin v. State,* 1987 OK CR 265, ¶ 15, 747 P.2d 316, 319–320, might well apply.

prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise," we examine the scenes depicted on the tapes. The video reenactment using actors shows, in scene one, the inside of the Bronco II depicting where the bullets entered the back rest and side panels; scene two shows the dowel rod in alignment with the entry into the left side of the victim, the path through the body and the exit out the lower right back and into the seat; scene three shows the approximate position the victim's body would be in if the shooter was standing outside, leaning in the open driver's door firing the weapon; the fourth scene shows the weapon along the required bullet trajectory into the left side of the victim's neck while the shooter is standing outside the vehicle leaning into the open driver's door.

¶ 22 The fifth scene shows the shooters position while seated in the drivers seat and shooting into the left side; the sixth scene shows another angle of the side shot while the shooter is seated in the driver's seat; the seventh scene shows the shooter seated in the driver's seat and shooting into the left neck—it shows that "[t]he correct bullet trajectory through the head and into the vehicles side panel requires the head to be lying over to the right and very close to the panel;" the eighth scene shows the weapon held approximately thirteen inches away from the entry wounds showing the "correct angle" through the body and head; the ninth scene shows the body movement required for the victim to have attacked with a knife held in his left hand. This shows that a bullet fired at this time would not align with the path through the body and into the seat backrest. The tenth scene shows the movement required by the driver in reaching for a weapon under the front edge of the front seat. This shows the difficulty of placing the weapon in a correct alignment while the arm of the victim would be in the way. The last scene shows that if the victim first attacked Harris's leg and then Harris reached for the gun, the victim would have the opportunity to further attack Harris in the back with the knife.

¶ 23 The computer animation was played next. The computer animation dealt only with the trajectory of the bullet through the victim's abdomen. The tape shows the line of trajectory through the body and how the line of trajectory changes if the victim were in the act of stabbing with a knife held in the right hand.

¶ 24 At the conclusion of the playing of the video tapes, Bevel concluded that the victim was "sitting [in] the passenger's seat with it scooted as far back as you could, and then with the back rest reclined in the furtherest [sic] position that it can be. That his head would have had to have been very, very close to the right side panel at the . . . time that this occurred . . . . that general body position is in agreement with for all four shots at the time that they occur." Bevel further opined that the victim was not in an aggressive mode at the instant that he was shot by any of the four shots. Bevel also believed that there was no other way the shots would have lined up other than his conclusion.

¶ 25 Bevel explained that the three bullet wounds to the head were close together, and the exit wounds were similarly close together; therefore, the trajectories were similar. The bullet passing through the victim's abdomen traveled in a straight line; therefore, it was possible to faithfully reproduce the trajectory through the body. With the measurements of the bullet trajectories, entry and exit wounds, it was possible through scientific and/or technical analysis to come to a conclusion about the position of the victim's body at the time of the shooting.

¶ 26 After viewing these tapes in their entirety, we conclude that the probative value of having the video and computer generated crime scene reenactments available to explain Bevel's expert testimony was not substantially outweighed by any of the dangers enumerated in 12 O.S.1991, § 2403. On the contrary, expert testimony can be very confusing. These tapes cleared up the confusion and made the expert's testimony easier to understand.

¶ 27 At the conclusion of Bevel's testimony, the judge gave the following instruction: "The specific scenes shown in the videos of the State in which there purports to be

specific self-defense moves have not been advanced by the Defendant." Although, not the model instruction which we set forth in the guidelines, the failure to give the new model instruction in this case is not fatal. Bevel faced vigorous cross-examination by defense counsel. Further, Harris submitted testimony by his own crime scene expert which illustrated the potential weaknesses in Bevel's reenactments. Both the cross-examination of Bevel and Harris' expert made clear to the jury that the video and computer generated crime scene reenactments were merely re-creations of the proponent's version of the events. Moreover, the trial court gave the general instruction on expert testimony which states that the testimony is to be given such weight and value as the jury deems it is entitled to receive.

¶ 28 We conclude that the tapes were properly used to illustrate the testimony of the expert witness. The demonstrations are similar to the ones performed live in front of the jury in *Romano v. State*, 1993 OK CR 8, 847 P.2d 368. There, an investigator showed how a rope could be used as a garrotte by placing it around the neck of an Assistant District Attorney. As in *Romano*, the tapes in this case were not so prejudicial as to substantially outweigh the probative value of helping the jury understand how this crime occurred. Furthermore, Harris was able to thoroughly cross-examine Bevel as to his opinion and the demonstrations. Therefore, the trial court did not abuse its discretion in permitting the video reenactments to be displayed for the jury during trial.

¶ 29 In proposition two, Harris alleges prosecutorial misconduct. Harris first complains that the prosecutor urged the jury to conduct experiments in the jury room. Harris objected, and the trial court instructed the jury that this was only argument and ordered the jury not to conduct any experiments while in deliberations. We believe that the admonition and order of the trial court cured any error in the argument as there is no evidence that the jury conducted any experiments. *Charm v. State*, 1996 OK CR 40, ¶ 60, 924 P.2d 754, 770.

¶ 30 Harris next complains that the prosecutor attempted to elicit sympathy for the victim when he stated:

That so called apology to Mr. And Ms. Gonzales was insulting, at the very least, four years later—he never once wrote a note—to invade their personal province. A.J. Pearce will be eighteen years old in his mother's eyes forever. His mom will relive that night every single night and day, for that matter, for the rest of her life. She'll always suffer that fate, and her and Don's sorrow is deeply personal.

At some point in each of our lives, we encounter the reality of death and are struck by its absolute finality. For some it comes traumatically on the field of battle, in a car accident, or maybe just being at the bedside of a dying loved one, watching in anguish as their life and soul part, and their soul drifts away from their body. For Don and Sydney Gonzales, it arrived with a shock of a child's unexpected demise.

I'm speaking now of their deeply personal and private feelings that come immediately after that shock, when their very soul instantly falls into a dark bottomless hole. The experience involves the sudden realization that someone who had been and was a big part of their life, of their moving, talking, touching, living world, simply would not be there anymore. They knew at that awful moment, after Sheriff Burrows came knocking on their door in the middle of the night, that knock or that call that everyone of us that are parents dread, that their son A.J. would not be there tomorrow or all of the days after tomorrow. There was a realization that left in its wake a dreadful emptiness and sense of loss so deep and sad that there forever remains an abyss in their own lives.

¶ 31 Harris interjected an objection at this point and the trial court sustained the objection and ordered the prosecutor to move on. Harris did not request that the jury be admonished.

¶ 32 The prosecutor's next comment was as follows:

There never was, there is not now, and there never will be any remorse from Ben

Harris for what he did because he intended to do it, and he thinks in his arrogance that he's above the law. A.J. will never get to experience the joys of maturity or adulthood, having children and grandchildren.

¶ 33 The trial court admonished the jury to disregard the comments, *sua sponte.* The prosecutor continued on with the following:

They've tried to make A.J. out to be some monster or some villain and hope that you'll be indifferent about his life being taken. A.J. couldn't be here to defend himself and his honor, but somewhere out there, there is a voice that cries out for the spirit, and that's asking you to stand up for what's right and just. Even if his parents aren't the Police Chief and even if he wasn't the most liked or popular kid in town, that voice is asking for justice for the person responsible for his violent and much too premature death.

However, Harris made no objection to these comments. Later the prosecutor stated:

A.J. Pearce and his parents are not lucky enough to have the chance for him to live his life in prison, where they can all visit him every weekend. The Defendant made that decision for them all by his self. If Ms. Gonzales wants to see A.J., she'll have to go to the grave yard and talk to the headstone.

Again, the trial court admonished the jury to disregard the comments and instructed the jury "that sympathy is not to play a part of this trial." We are convinced that the trial court's instructions cured any error created by the prosecutor's argument. *Id.* The comments made without objection did not rise to the level of plain error.

¶ 34 Next, Harris complains that the prosecutor misstated the facts in his closing argument. First, Harris complains that the prosecutor stated that the victim was asleep when he was shot. This conclusion was based on the evidence and expert opinion. There was no error here. Other facts argued did not receive a contemporaneous objection; therefore, Harris has waived all but plain error. These comments included statements that: Harris had a blood-alcohol content of .18 percent; that Harris was moti-

vated to kill Pearce based on a fight in 1994; that Pearce had a bottle of orange juice between his legs. The fact that Pearce had a bottle of Sunny Delight Orange Juice between his legs was supported by the testimony of Deputy Klein. Harris' own expert testified that he understood that Harris had a blood alcohol content of 0.18. There was testimony from Harris himself that he and Pearce had a fight in 1994. These comments did not constitute error because they were within the wide latitude permitted during closing argument, and they were based on the evidence. *Short v. State,* 1999 OK CR 15, ¶ 72, 980 P.2d 1081, 1104.

¶ 35 Harris complains that the prosecutor personally attacked counsel and the defendant by accusing them of misleading the jury. The prosecutor argued,

I'll tell you, John Thomas Hall is a good criminal defense lawyer. He's got a knack for putting a little twist or spin on things, making things sound better than they really are. But when you cut through all the rhetoric and the theatrics and snorting around here and interrupting witnesses here and there and all they really got—

Counsel interposed an objection at this point and the trial court ordered the jury to "disregard any comments regarding counsel for the defense's conduct." The prosecutor next stated,

They're hoping that if they can get anywhere near self-defense and make the dead guy look so bad, that he needed to be killed anyway, they're hoping that you'll ignore your oath and follow the law in the Instructions and make that—

Counsel again objected and the trial court reminded the jury that the statements were "argument only." Next, the prosecutor stated,

They want you to make that great leap across the Grand Canyon of something by the leg is justification for shooting A.J. Pearce in the head three times. We called several witnesses after Jerry McGrath to cast some serious doubt on this self-defense theory, the self-defense story, what the Defendant was saying.

The Court, as before, admonished the jury to "disregard counsel's comment in regard to Defendant's desiring you ignore your oath." We find these admonishments cured any error. Later, the prosecutor stated:

This whole amnesia thing just doesn't hold water. I guess it's one explanation why he can't remember anything, but it can be faked as well. And another more likely explanation is that the Defendant's lying, that he's just not telling the truth. Physical evidence supports that. It's difficult to tell a lie over and over if you have to supply the details. It's easier to say, "He tried to stab me. That's all I remember." It's as plain as the nose on your face, Ben Harris is lying just as sure as he sits here today. Don't let them hornswoggle you with that amnesia stuff. You know, and we know, and he knows what he did.

There was no objection to these comments. Later, in the argument the prosecutor stated, "Don't let them swindle you into believing that somehow you're guilty of wrongdoing if you determine he's guilty and deserves the—." The trial court, at that point, overruled the objection, but reminded the jury that the comments were "argument only."

■ ¶ 36 Harris complains about two more comments that did not receive contemporaneous objections:

Chris said it a while ago, when you dip into that character barrel instead of looking at the facts in the case, when you start asking friends and relatives of the parties for help, you're in trouble because they're emotionally involved. They're completely biased, and they'll lie if they have to.... I just hope and pray that you reasonable people who took your blinders off at the door and wont be hoodwinked into believing something that clears a man of murder when there is absolutely no evidence to support it, and all the evidence there is contradicts it.

Because, there was no contemporaneous objection to these comments, all but plain error was waived.

¶ 37 These arguments are somewhat similar to the "smoke screen" arguments which we have condemned in the past. *Stewart v. State*, 1988 OK CR 108, ¶ 21, 757 P.2d 388,

396. However, when the argument is merely an attempt to urge the jury to use their common sense and not be swayed by irrelevant or illogical evidence, the comments are proper. *See Wilson v. State*, 1998 OK CR 73, ¶ 100, 983 P.2d 448, 470 (similar comments made during voir dire). We find that the comments which were properly preserved did not amount to error as they fell into the latter category of argument; the remainder did not amount to plain error.

■ ¶ 38 Harris argues that the prosecutor invoked societal alarm and invoked his personal opinion of guilt during closing argument. The comments complained of by Harris, in the order they appeared in the record, were as follows:

Its blasphemy on the rights to keep and bear arms to attempt to hide behind the Second Amendment, the right to justify this brutal murder....

I know lots of homicides that have motives that involve two men and one girl. Tara Klein's relationship with A.J. may not have been a problem for Tara, and Ed Klein says it wasn't a problem for him. I find that a little hard to believe, but that's what he said....

I find the timing on A.J.'s open display of his infatuation for Tara that night to be a little too close to the murder to be passed off simply as coincidental. Let's see. If A.J.'s wanting to date the ex-wife of the Defendant's uncle, possibly infatuated like an immature kid might be, while A.J. is sound asleep later that night, the Defendant brings up that A.J. shouldn't be dating Tara. And then he shoots and kills him, shoots him four times. That sounds a whole lot like murder, and that sounds like a motive for it too....

He remembers running off the roads. He remembers having feelings during this. Well, that's just too convenient to suit my theory....

Well, his statement about why he disregarded that stuff which was inconsistent with Ben's denial of his total inability to recall just amazed me....

Dr. Call's honest opinion was that he couldn't rule out any of the three possibili-

ties, including lying. And when pinned down by Chris, Dr. Hand said he couldn't either. . . .

You know, we know, and he knows what he did. And it was a terrible, terrible thing to take that kid's life the way he did. A.J. Pearce never had a chance. He died in his sleep without ever knowing what hit him. Don't let Ben Harris take the life of an eighteen-year-old young man, and just walk away and walk right out that door behind you like nothing ever happened. He took another human being's life. Can you even begin to understand the enormity of that? . . .

Our client, the State of Oklahoma and the people of Washita County, have the right to see that those who break the law and do such terrible things are brought to justice for them. Today we lay this case at the feet of you twelve, to you citizens for your approval. Four years later and two weeks of trial time, today we turn to you. You're the only one and the only hope that we have for this justice that we seek. Please don't let us down. . . .

It is a sobering thought to consider having to assess a guilty verdict against a young man like that. I don't take it lightly for a moment. There is nothing pleasant about it. Citizenship in our county sometimes comes with a price. There are times, as part of our civic and moral duties of citizenship, that we're called upon to face unpleasant and difficult tasks.

Ladies and Gentlemen, I say once more: We're a government of laws and order, and order will not survive without laws. And laws cannot be expected to prevail, and I'm sure that our system which has survived since 1776, will survive 223 more years. That means we can have a system of justice that you, the people, can trust and can have faith in and can be confident in the result and support. . . .

You have to decide whether this case and this Defendant merit the penalty, life in prison with the possibility of parole or life in prison without the possibility of parole, if you find him guilty. And if you so decide, then you haven't sent anybody to prison, you've simply followed the law.

It's the law that the Court laid out for you, and the legislature set for us. It's the law that has preserved this justice system for others to benefit in the future.

None of these comments received contemporaneous objections. Most of them are fair comments on the evidence, although the prosecutor failed to distinguish that he was commenting on the evidence and not stating his opinion. We find, taken in context with the entire argument, that the comments did not rise to the level of plain error.

¶ 39 Next Harris complains about the prosecutor's questioning of a character witness about his knowledge that Harris was a member of the Aryan Nation in prison who had robbed and beat people in prison. The question received an objection and the jury was admonished to disregard the question. We believe that the jury followed the admonition, and the error was cured. *See Koehler v. State*, 1986 OK CR 110, ¶ 5, 721 P.2d 426, 427 ("we have long held than an admonishment to the jury is presumed to 'cure' most errors, unless the error was so prejudicial that the error undoubtedly would taint the verdict.") The statement in this case did not undoubtedly taint the verdict.

¶ 40 In proposition three, Harris argues that there was insufficient evidence to support a conviction for first degree murder. Harris admitted during cross-examination that he intentionally shot and killed Pearce. He tried to claim self defense, however his lack of memory of the exact events makes his self-defense claim incomplete. Harris presented no evidence that he made a decision to shoot based on a reasonable apprehension that he was in fear of death or great bodily harm. There was evidence that Harris cut his jeans himself and shot Pearce while Pearce was reclined, possibly asleep, in the passenger seat of the Ford Bronco II.

¶ 41 The evidence in this case consisted of both direct and circumstantial evidence tending to prove that Harris committed the crime of first degree murder. Therefore, we find that after reviewing the evidence in a light most favorable to the State, there was sufficient evidence for any rational trier of fact to have found the essential elements of first

degree murder beyond a reasonable doubt. *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04.

¶ 42 The judgment and sentence of the trial court is **AFFIRMED**.

JOHNSON, J.: Concurs.

LUMPKIN, V.P.J.: Specially Concurs.

STRUBHAR, P.J., and CHAPEL, J., Dissent.

**LUMPKIN, VICE–PRESIDING JUDGE:** Specially Concur:

¶ 1 I compliment my colleague on his scholarly analysis of a complex issue. The analysis correctly applies the Oklahoma Evidence Code in a legally sustainable manner. The use of computers in the development of evidence, demonstrative or otherwise, must be approached with trepidation due to the complexity of validating the underlying methodology leading to the result being offered as evidence. However, regardless of our preferences for or against this type of evidence, the Oklahoma Evidence Code, supported by our adoption of *Daubert v. Merrell Dow Pharmaceuticals*[1], together with *Kumho Tire Co. v. Carmichael*[2], allows its admissibility if it meets the guidelines established. It is, and will continue to be, the awesome responsibility of Oklahoma trial judges to ensure the validity and relevance of the proffered evidence.

¶ 2 In the past, demonstrative evidence has often consisted of charts and diagrams prepared by hand and utilized by witnesses during the course of trial to explain the testimony given. Eye witnesses and investigators may mark positions of parties or items on these exhibits to allow jurors to gain perspective on where persons or objects were located at the scene depicted. As a result of that testimony and marking, the exhibit is often admitted into evidence and allowed to be taken to the jury room for consideration with other evidence in the jury's deliberations. *See Brown v. State,* 989 P.2d 913, 934–935 (Okl.Cr.1998) (diagrams of victim's injuries); *Wilson v. State,* 983 P.2d 448, 468 (Okl.Cr.

1998) (diagram of crime scene). It would seem that consistency demands the same treatment of the video and computer generated reenactments addressed in this case. This Court clarified its analysis of determining what exhibits should be taken to the jury room in *Duvall v. State,* 780 P.2d 1178, 1180 (Okl.Cr.1989). The reenactments are not testimony subject to the provisions of 22 O.S.1991, § 894. Therefore, if admitted into evidence the exhibits should be taken to the jury room for consideration with the other evidence presented.

¶ 3 I also believe it is incumbent upon the trial judge to ensure the scope of expert testimony is properly limited. *See White v. State,* 973 P.2d 306, 314 (Lumpkin, J., specially concurring) It is even more imperative in cases which present expert testimony plus video/computer generated reenactments that the jury be instructed at the time the evidence is presented, in addition to the final written instructions, as to the limited purpose of the evidence and the expert testimony. Courts must ensure the jurors are impressed with the import of their duty as the sole adjudicators of the facts of the case which must then be applied to the law upon which they are instructed. Experts and technology do not decide the results in cases, jurors do. To assist trial judges in the challenges created by our evolving technology, I continue to urge the Oklahoma Legislature to adopt the provisions of Rule 706 of the Federal Rules of Evidence and to provide judges with the resources needed to address this evolving technology. *See Taylor v. State,* 889 P.2d 319, 343 (Okl.Cr.1995) (Lumpkin, J., concur in result). Our district court judges continue to perform their duties in an outstanding manner with limited resources and support staff. It is incumbent upon the Executive, Legislative and Judicial branches of this State to work to ensure funding and statutory empowerment is provided to them to address the challenges of the 21st Century.

**CHAPEL, J., Dissenting:**

¶ 1 I find merit in Proposition I. Harris claimed he shot Pearce after Pearce cut his

---

**1.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)

**2.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)

thigh with a knife. The State claimed Harris shot Pearce as he drove, while Pearce was sleeping in the reclined passenger seat. In support of that theory the State introduced two videotapes. One contained a crime scene reenactment and the other was a computer-animated dramatization. These were used as illustrations of the State's theory of the case, admitted into evidence, and available for the jury to view during deliberations. They should not have been used or admitted. This error prejudiced Harris and warrants reversal.[1]

¶ 2 I agree with the majority that these videos are similar to posed photographs. However, they are not photographs, but videotapes intended to be shown on a television or computer screen. Oklahoma law prohibits posed reproductions intended to illustrate hypothetical situations.[2] Crime scene reproductions must be shown, by extrinsic evidence, to be faithful representations of the place or subject as it existed at the time of the crime.[3] Reenactments may not be used to illustrate the State's theory of the crime.[4] Courts across the country have struggled with the admission of videotape reenactments and computer dramatizations. The common concern is the danger inherent in admitting this technology—"When people see something on television, they think it is real even when it is not."[5] The majority notes the "very real danger" that jurors may believe they are seeing a depiction of the actual event.[6] This is particularly true given the popularity of "real-life" television shows, where jurors may have regularly seen crime scene reenactments presented as true. We cannot assume jurors will understand, without instruction, that a videotape admitted into evidence reflects the point of view of the party introducing it, rather than depicting the "truth" of the case.

¶ 3 The majority suggests we adopt stringent guidelines modeled after those used in South Carolina to ensure the fairness and usefulness of this type of evidence without admitting prejudice.[7] Before admitting a computer-generated or video crime scene reenactment, the proponent must show the animation is (a) authentic and a fair and accurate representation of the evidence to which it relates, and (b) relevant; (c) its probative value must substantially outweigh the danger of unfair prejudice. The opposing party must have had the opportunity to examine the reenactment and underlying data.[8] The trial court is required to contemporaneously instruct the jury that the exhibit represents one version of the facts and is not an actual recreation of the crime. These guidelines represent the minimum protection necessary to avoid prejudice and jury confusion where video reenactments are introduced. However, although the opinion recognizes this, the majority refuses to accord Harris their protection.

¶ 4 In determining that these tapes were not used improperly the majority purports to apply the guidelines above. Of course, this is not a proper exercise on direct appeal—the point of the guidelines is that they are to be used by a trial court before the reenactments are used at trial. The majority finds that the tapes were not prejudicial because expert testimony "can be" very confusing. I believe the expert's testimony was not so confusing

---

1. 20 O.S.1991, § 3001.1.

2. *Langley v.State*, 90 Okl.Cr. 310, 213 P.2d 886, 892–93 (Okl.Cr.1950); *Roberts v. State*, 82 Okl. Cr. 75, 166 P.2d 111, 117–18 (Okl.Cr.1946).

3. *Langley*, 213 P.2d at 892, quoting *Colonial Refining Co. v.. Lathrop*, 64 Okl. 47, 166 P. 747 (Okl.1917); *see Massey v. Ivester*, 168 Okl. 464, 33 P.2d 765 (Okl.1934).

4. *Robison v. State*, 1984 OK CR 21, 677 P.2d 1080, 1087.

5. *Sommervold v. Grevlos*, 518 N.W.2d 733, 737 (S.D.1994).

6. Opinion at 494.

7. *Clark v. Cantrell*, 339 S.C. 369, 529 S.E.2d 528, 536–37 (S.C.2000) (civil suit setting forth guidelines for use of computer-generated video animation as demonstrative evidence).

8. I note this differs from the South Carolina guidelines, which direct courts to consider whether the animation and data were disclosed a reasonable time prior to trial. The majority opinion could be read to conclude that disclosure during trial is sufficient if the disclosure occurs before the evidence is introduced. I believe this violates both the letter and spirit of our criminal discovery procedures.

that it required visual accompaniment. More importantly, whether the jury would have been confused without the exhibit is not the relevant question to ask when determining prejudice. That merely establishes the exhibits' probative value, if any.

¶ 5 We should look at whether Harris was unfairly prejudiced, whether the evidence was cumulative, or whether the jury was misled. The answer to these questions is "yes." Both tapes portrayed the same actions, and both were visual versions of the expert's testimony. The jury was exposed to these theories three times. As the majority admits, there is always the danger that the jury will believe they are seeing the actual crime, not an illustration of the State's point of view. Harris was prejudiced when the jury saw not one but two video reenactments—one computer-generated—showing how the crime was committed. The jury was not instructed that these were intended to be persuasive tools illustrating the expert testimony; in fact they received no instruction on the use of the tapes beyond a caution that Harris had not advanced all the arguments the tapes tried to refute. The jurors also improperly had the option of viewing the tapes again during deliberations. Neither vigorous cross-examination of the expert nor use of Harris's own crime scene expert can cure this error. These tapes were inappropriately used as demonstrative aids then admitted into evidence. The majority claims the experts' testimony showed the jury these tapes were not actual depictions of the crime itself. If that were true there would never be a need for the elaborate precautions the majority determines are necessary in future cases.

¶ 6 These tapes should not have been admitted under current Oklahoma law. They show neither events at the time of the occurrence nor the victim's injuries. They are unlike crime scene videos because they were fabricated to illustrate the State's version of events, not taken at the scene immediately upon discovery of the crime. Neither tape

merely demonstrates the victim's injuries or the bullets' paths, which might have been admissible.[9] Each video has two figures and purports to show where the defendant and victim were in relation to one another when portraying a series of possible events.

¶ 7 The State hired actors and computer experts to prepare a set of videotapes designed to persuade the jury that its version of events was accurate. Because of the overwhelming potential for prejudice, video crime scene reenactments must be viewed with great caution. If this Court wishes to enact guidelines to protect parties' rights and guard against prejudice, this Court should apply those underlying principles to this case. Any serious consideration of the prejudice here must result in reversal. I also note that, if we allow the State to use technological reenactments purporting to describe the evidence, we are bound to provide the same resources to defendants. I would reverse the case and remand for a new trial. I am authorized to state that Judge Strubhar joins in this dissent.

**9.** *See, e.g., Cleary v. State,* 1997 OK CR 35, 942 P.2d 736, 743. We held a styrofoam head pierced with dowels was admissible to show the bullet trajectories found during autopsy. The victim's head was, of course, unavailable. Noth-

ing about this exhibit indicated where the defendant was when the victim was killed, or in any other way illustrated any facet of the State's theory of the case.